By the Court,

Bronson, J.
Re-insurance is a valid contract at the common law. It is forbidden in England, except where the insurer shall be insolvent, become bankrupt, or die, by the statute (19 Geo. 2 ch. 37, § 4). But it is in use in most of the other maritime state of Europe (1 Marsh, on Ins. 143, 1 Beames Lex Merca. 467), and has been sanctioned in this state and in Massachusetts (Hastie v. De Peyster, 3 Caines, 190. Merry v. Prince, 2 Mass. R. 176). It is true that these cases arose on marine policies, but there is no difference in principle, so far as this question is concerned, between reassurance against loss by fire or by the perils of the sea. An underwriter may wish to change his business, or he may have taken a greater risk on a particular subject, or in the same immediate neighborhood, than he is willing to encounter. In these, as well as in other cases that might be suggested, there is no principle of public policy which forbids him to seek an indemnity by means of a re-insurance, either in whole or in part, on the same risk. Should this contract be perverted to improper purposes as is said to have been the case in England, the legislature may interfere in this country as it has in that, and prescribe the cases in which re-insurance shall not be permitted. [363]
Although the plaintiffs had no property in the subject mentioned in the original policy, the risk which they had assumed in relation to the subject was an insurable interest (Phillips on Ins. 56). Re-assurance is not a wager, but a contract of indemnity. 1
The objection taken on the trial to the form of the policy, contains no "legal proposition.
It is objected that these companies had no authority under-their charters of incorporation to enter into the contract of re-insurance. By the 6th section of the act incorporating the plaintiffs, Laws of 1832, p 292, they have power “ to make contracts of insurance against loss by fire of any houses or buildings whatsoever, and of any goods, chattels or personal estate whatsoever.” By the 6th section of the act incorporating the Bowery company, Laws of 1833, p. 296, they have power is to make al] *206 kinds of insurance against losses by fire, of any houses and buildings whatsoever; and also upon all goods, wares and merchandise whatsoever.’ Re-insurance is but a modification of the contract of insurance, and is, I think, clearly included in the power of the plaintiffs “ to make contracts of insurance,” and of the defendants “ to make all kinds of insurance ” against losses by fire. A more serious question is presented in relation to the subject matter of the contract. If this can be regarded in no other light than the insurance of 'an ideal thing, (the risk which the plaintiffs had assumed,) it would be impossible to say that it falls within the powers of the Bowery company. It is neither houses, buildings, goods, wares nor merchandise, which are the only subjects which the company is authorized to insure. But this, like the primitive contract, was an insurance of the goods of Mortimer. The person insured in the two policies, as well as their interest in the subject, were different'; but the subject itself was the same in both. The power of the parties to make such a contract can not be questioned.
/ The next question which 1 shall consider, relates to the preliminary proofs. No objection was taken to the sufficiency of the proofs, as between Mortimer and the plaintiffs; but it was insisted that the papers furnished by [364] Mortimer did not amount to a compliance with the contract between the parties to this action. The ninth condition annexed to the policy provides, that “Persons sustaining loss or damage by fire, shall forthwith give notice thereof, &c. and as soon after as possible, they shall deliver as particular an account of their loss and damage as the nature of the case will admit &c.; and they shall accompany the same with their oath, &c.” In some respects, there has been a literal compliance with this condition. The “ perosns sustaining loss,” so far as this policy is concerned, are the plaintiffs: they were insured against the perils of their contract, and the loss or damage which they have sustained, is the amount of their liability to Mortimer. The plaintiffs gave immediate notice to the defendants of all the proceedings of Mortimer, including notice of the judgment which he recovered on the original policy, and the fact that the plaintiffs had paid the money. This was, in the words of the condition, “ as particular an account of their loss and damage as the nature of the case would admit.” But it was not accompanied by “ their oath; ” and this is the ground on which the defendants rest their objection. The contract should receive a reasonable interpretation; such an one as will carry into effect the intent of the parties, so far as it can be collected from an attentive consideration of the whole instrument. It was, I think, the oath of Mortimer, not the plaintiffs, which the parties contemplated. The oath was to show, “ whether any, and what other insurances, have been made on the same propery; what was the whole value of the subject insured; in what general manner (as to trade, manufacturing, merchandise, or otherwise), the building insured or containing the subject insured, and the several parts thereof were occupied at the time of the loss, and who were the occupants of such building, and when and how the fire originated, so far as they know or believe.” These were facts resting peculiarly in the knowledge of the owner of the property—the person originally insured—and it was his oath which the defendants were interested to require. They were matters about which, from the nature of the [365] case, the plaintiffs could not be supposed to have any particular knowledge. The only reasonable interpretation of the contract, is that which requires this oath to be made by Mortimer, the person who owned and had the custody of the goods at the time of the fire, and who alone knew the facts which were required to be stated in the affidavit. It was his oath that the assurers wanted, to guard against imposition and fraud. The same remark is applicable to the certificate of a notary, stating, among other things, that “ he is acquainted with the character and circumstances of the insured *207 Or claimant, and that he verily believes that he, she or they, have by misfortune, and without fraud or evil practice, sustained loss and damage on the subject insured ’’ to a certain amount. A certificate concerning the character and circumstances of the re-assured, and that there had been no fraud or evil practice on their part, would have been an idle and unmeaning ceremony. To hold thatthis was what the parties intended, would be following the letter, while we lost sight of the spirit and substance of the compact.
No doubt seems to have been entertained by the judge, that the testimony of Thorne, the secretary of the Jefferson Insurance Company, gave rise to a question of some kind, for the consideration of the jury. The facts stated by him to Merchant, the secretary of the plaintiffs, were calculated to make a strong impression on the mind of an underwriter for Mortimer ; and if they had been communicated to the defendants at the time of the application for the reassurance, it can hardly be doubted that they would either have demanded a greater premium, or declined the risk altogether. If neither of these courses had been adopted, they would at least have taken time to make inquiries into the character of Mortimer. It is true that Thorne did not, with absolute certainty, identify the Mortimer of whom he spoke, with the one insured by the plaintiffs; but there remained little more than a mere possibility that there were two persons of that name, answering to the same description. The witness gave not only his sir name, but his occupation, which was not of a kind likely to include a great number of individuals. This was not all. He gave the place of his residence, and the [366] street in which he carried on business. No doubt seems to have been entertained by Merchant, that the person insured by his company was identical with the person of whom Thorne spoke, and none could well have been entertained by any one. But if there was any uncertainty about the person, the value of the evidence was to be estimated by the jury under proper instructions from the court.
The information which the plaintiffs possessed, and which they withheld from the defendants, was, I think, material to the risk. It seems to have been so regarded by the plaintiffs themselves. The policy to Mortimer was issued by Merchant on the 3d of February, in the absence of the president of his company. When the president returned the next day, he disapproved of what had been done, and ordered a reinsurance. But nothing was done by Merchant, the secretary, because, as he says, he thought it a good risk, and hoped to remove the president’s objections. He adds, he thought he had nearly quieted the fears of the president, and persuaded him to keep the risk. That he was right in this supposition, is rendered highly probable, from the fact, that although the president expressed his disapprobation and ordered reinsurance on the 4th of February, nothing was done until the 11th, and after the conversation with Thorne. After learning the character of Mortimer, no time was lost in applying for reinsurance. If the concealment of this information had, under proper instructions, been submitted to the jury as a question of actual fraud on the part of the plaintiffs, it is impossible to say that their verdict would not have been in favor of the defendants. But if the facts concerning Mortimer's character were material to the risk, it is enough that they were withheld by the plaintiffs on applying for reassurance.
The general doctrine on this subject, is not denied; but it is said that the character of Mortimer was not-a fact material to the risk; and the person applying for insurance is not bound to say any thing about his own character. The last branch of the remark is undoubtedly true. Had Mortimer applied to the defendants for insurance, he was not bound nor could [367] it be expected that he should speak evil of himself. Good manners on the part of the underwriter, and self respect on the part of the applicant, would forbid a conversation on the subject of character. If the underwriter *208 wished information on that point, he would naturally seek it from some other source. But this case presents, I think, a different question. There was no law of social intercourse forbidding the plaintiffs to speak of the character, of a third person; especially in a matter of business, where character became an important inquiry. But it is said that Merchant might have subjected himself to an action of slander, if he had repeated the words of Thorne, and it should turn out that they were untrue. I do not so understand the law. When a man without any intent to defame, repeats, in the legitimate course of business and for an honest purpose, what he has heard of the character of another, I have yet to learn that he is liable to an action if the information prove erroneous. Merchant had no legal excuse for withholding the information derived from Thorne, and I think he was bound to speak. The rule on this subject is very broad. “Every fact and circumstance-which can possibly influence the mind of any prudent and intelligent insurer, in determining whether he will underwrite the policy at all, or at what premium he will underwrite it, is material ” (1 Marsh, 467). He must even give doubtful news concerning the ship, in cases of marine insurance, however little credit he may give to it himself (1 Marsh. 471; Phillips, 93, 95).
This question was not properly submitted to the jury. They were instructed, in effect, that although they should think the information material, they must still find for the plaintiffs unless it was unintentionally withheld. There was no ground for submitting such a question to the jury. It was not raised by the evidence. And besides, if the facts communicated by Thorne ■were material, it is enough that they were withheld by Merchant on applying for reassurance. Whether the omission was the result of mistake or design, was not an important inquiry. The assured acts at his peril [368] in withholding information (Shirley v. Wilkinson, Doug. 306, note; Kohne v. Ins. Comp. N. A., 1 Marsh. Ins. 743, note; Carter v. Boehm, 3 Burr. 1909; Thompson v. Buchanan, 4 Bro. Parl. Cases, 482; Phil, on Insurance, 80).
I think the policy was void, on the ground that no notice was given to the defendants of the insurance of Mortimer on the same goods by the City Ins. Company. But as it is not now necessary to decide this point, and my brethren are not prepared to pass upon it, I shall not assign the reason for my own opinion. The judgment is reversed, on the ground that the charge was erroneous, and a venire de novo is ordered in the court below.
Judgment reversed.