CHRISTIANA GENERAL INSURANCE
CORPORATION OF NEW
YORK, Plaintiff,

v.

GREAT AMERICAN INSURANCE
COMPANY, Defendant.

No. 87 Civ. 8310 (PKL).

United States District Court,
S.D. New York.

Aug. 9, 1990.

Walder, Sondak, Berkeley & Brogan, Roseland, N.J., Budd, Larner, Gross, Picillo Rosenbaum, Greenberg & Sade, New York City (James A. Plaisted, Mark L. Alexander and Donald M. Emeigh, Jr., of counsel), for plaintiff.

Bower & Gardner, New York City (Thomas R. Newman, Thomas M. Bower and Barry T. Bassis, of counsel), for defendant.

1. The policies actually began mid-year, so that the 1980 policy actually ran from mid–1980 to mid–1981. Hereinafter, the Court will refer to

## OPINION AND ORDER

LEISURE, District Judge.

This is a declaratory judgment action, filed pursuant to 28 U.S.C. § 2201. The jurisdiction of this Court is based on diversity of citizenship. Plaintiff seeks a declaration from this Court stating that, *inter alia*, plaintiff is not obligated to indemnify defendant for losses incurred under certain reinsurance policies between the parties. Extensive discovery has taken place in this action, and the parties have now cross-moved for summary judgment, and plaintiff has moved for attorneys' fees. Additionally, plaintiff has moved to amend its complaint, should its summary judgment motion be denied.

## BACKGROUND

The essential facts of this action are not in dispute. The disputed issues will be discussed below in the body of this opinion. This case arises out of reinsurance contracts between the parties. For four policy years stretching from 1980 to 1984[1], plaintiff Christiana General Insurance Company of New York ("Christiana") agreed by contract to reinsure certain risks insured by defendant Great American Insurance Company ("GAIC"). In the instant action, Great American was an excess insurer on a policy issued to American Honda Motor Company, Inc. ("American Honda"), and to various American Honda subsidiaries and affiliates. For the 1980 and 1981 policy years, GAIC's contract with American Honda stated that GAIC would provide $10 million in coverage in excess of $15 million dollars in losses. Thus, should American Honda's insured losses for one of those years exceed $15 million, GAIC would be obligated to cover those losses, up to $10 million. For the 1982 policy year, GAIC provided $10 million in coverage in excess of $17 million, and for the 1983 policy year, GAIC provided $7 million in coverage in excess of $18 million.

In each of the policy years 1980 through 1983, Christiana reinsured a portion of GAIC's liability obligation to American

the policies by the year in which each individual policy began. Thus, the four policies at issue are the 1980, 1981, 1982 and 1983 policies.

Honda.[2] Reinsurance is a contract between two insurance companies designed to spread the risks associated with insuring large accounts. Under a reinsurance contract, one insurer, known as the ceding insurer, transfers all or a portion of the risk it has underwritten to another insurer, known as the reinsurer, for a portion of the premium paid by the insured to the ceding insurer. *See Colonial American Life Ins. Co. v. Commissioner,* — U.S. —, 109 S.Ct. 2408, 2411, 105 L.Ed.2d 199 (1989). As Judge Kevin Duffy of this Court has succinctly put it, "Reinsurance is simply an insurance policy issued to insurers." *Employers Ins. of Wausau v. American Centennial Ins. Co.,* No. 86 Civ. 8576 (KTD), slip op. at 2, 1989 WL 6631 (S.D.N.Y. Jan. 24, 1989).

Reinsurance is a means for insurance companies to spread the risks they assume from insured, and to lessen the impact any individual company will suffer in the event of a catastrophic loss. Reinsurance comes in two basic forms: "treaty" reinsurance, and "facultative" reinsurance. Treaty reinsurance "involves an ongoing agreement between two insurance companies binding one in advance to cede and the other to accept certain reinsurance business pursuant to its provisions." *Sumitomo Marine & Fire Ins. Co. v. Cologne Reinsurance Co.,* 75 N.Y.2d 295, 301, 552 N.Y.S.2d 891, 894, 552 N.E.2d 139, 142 (1990). Facultative reinsurance, on the other hand, "involves the offer of a portion of a particular risk to one or more potential reinsurers, who are then free to accept or reject the risk in whole or in part." *Id.* (footnote omitted) (*citing* Thompson, *Reinsurance,* at 75 (4th ed.1966)). A separate reinsurance certificate is typically issued for each risk assumed by the facultative reinsurer. The reinsurance is often placed through a broker employed by the ceding insurer, and, in the case of facultative reinsurance,

a single risk is often placed with a number of reinsurers, each assuming a portion of the ceding insurer's risk. The case at bar involves facultative reinsurance.

In the instant case, GAIC, after entering into its insurance agreement with American Honda, utilized a licensed New York reinsurance intermediary, Willcox, Barringer & Co. ("Willcox"), who brokered GAIC's American Honda liability to a number of reinsurance companies, including Christiana.[3] Provision 7 of each of the facultative reinsurance certificates provides:

> Prompt notice shall be given by the Company [GAIC] to the Reinsurer of any occurrence or accident which appears likely to involve this reinsurance and, while the Reinsurer does not undertake to investigate or defend claims or suits, the Reinsurer through its representative and/or counsel, shall nevertheless have the right and be given the opportunity to associate with the Company and its representatives at the Reinsurer's expense in the defense and control of any claim, suit or proceeding which may involve this reinsurance, with the full cooperation of the Company.

It is this provision that underlies much of plaintiff's allegations in this action. Plaintiff asserts that defendant failed to give adequate notice to its reinsurers that defendant's excess insurance layer was likely to be pierced for most or all of the policy years reinsured in part by defendant. Plaintiff further alleges that failure to provide prompt notice to plaintiff and other reinsurers constituted a breach of a fiduciary duty of good faith owed to the reinsurers by GAIC. Finally, plaintiff contends that GAIC misrepresented the products and risks being reinsured, thus misleading plaintiff and other reinsurers into accepting risks they otherwise would have rejected.

**2.** The amounts of GAIC's obligations to Honda reinsured by Christiana were as followed: 1980: $500,000; 1981: $500,000; 1982: $1,000,000; 1983: $1,000,000. In each year, Great American retained $250,000 of the liability risk. The remainder not retained by GAIC, or covered by Christiana, was reinsured by other reinsurers.

*See* Defendant's Rule 3(g) Statement, Figures 1–4.

**3.** The reinsurance certificates between GAIC and Christiana for the policy years 1980–1983 are attached as exhibits A–D, respectively, to the Amended Complaint.

American Honda is the wholly-owned United States subsidiary of the well-known Japanese manufacturer of automobiles, motorcycles, power equipment and related products. American Honda is the exclusive distributor of Honda products in the United States. *See Cabriolet Porsche Audi, Inc. v. American Honda Motor Co.*, 773 F.2d 1193, 1198 (11th Cir.1985), *cert. denied*, 475 U.S. 1122, 106 S.Ct. 1641, 90 L.Ed.2d 186 (1986). Among the Honda products distributed by American Honda are all-terrain vehicles ("ATVs"). ATVs are three- or four-wheeled motorized vehicles capable of operating off-road. They come in a number of models designed for a variety of purposes. Some of the more powerful models, particularly in a four-wheel configuration, can be used as a small tractor. During the late 1970s and early 1980s, however, ATVs were principally marketed as recreational vehicles. Apparently, many users treated ATVs in a manner previously reserved for "dirt bikes"—racing them off-road or attempting to traverse difficult terrain at relatively high speeds. Most states did not require a driver's license or any other type of permit to operate an ATV, and only a few states required riders to wear a helmet or other protective gear. Accordingly, it was not uncommon for children under the age of sixteen to operate ATVs with little or no training or protective clothing.

ATVs, it turns out, were not well designed for the activities for which many Americans purchased them. The three-wheeled versions, which look similar to large, motorized tricycles with oversized, deep-tread tires, were particularly popular with off-road enthusiasts. The smaller, less-powerful three-wheel ATVs were popular amongst teenagers and children both as recreational vehicles and, in some cases, as a form of transportation. ATVs, particularly the three-wheeled models, turned out to be unstable and deceptively difficult to operate. In the early 1980s, as the popularity of ATVs began to increase, the number of accidents resulting from ATV use increased dramatically. The injuries suffered in ATV accidents were often severe. By mid–1985, there were 161 ATV-related deaths reported nationwide for the period from 1982 to 1985. Of those victims, 73 were under the age of sixteen, and 39 were under the age of twelve. There were also numerous reports of accident victims with severe brain and spinal cord injuries.

In the spring of 1985 the Federal Consumer Product Safety Commission ("CPSC") released a report, indicating that ATVs might pose an unreasonable risk of injury. Two months after its first announcement, the CPSC issued a proposed rule, designed to reduce the risks associated with ATVs, and initiated judicial action to ban the products as unduly hazardous. The CPSC action spurred journalistic interest in the ATVs. Between the two CPSC announcements in the spring of 1985, the ABC television news show *20/20* aired a segment which focused on the risks associated with ATVs, and on some of the accidents which had resulted from ATV use. Despite this publicity, American Honda continued to market and sell ATVs.[4] Finally, in 1988, with injuries and deaths from ATV use continuing to mount, American Honda and its parent entered into a consent decree with the CPSC to reduce the harm associated with ATVs. Specifically, American Honda agreed to cease selling all three-wheel ATVs, to limit sales of the remaining models to buyers of an appropriate age, and to undertake an extensive program to promote safe ATV use. This consent decree has, apparently, resulted in a significant reduction in ATV-related injuries.

The legacy of the ATVs is obvious in the instant action. As early as 1985, it was clear to at least some of American Honda's primary and excess insurers that the ATVs posed a serious liability problem. The number of lawsuits arising from ATV accidents was rising rapidly, and many of those claims were for substantial injuries which would likely result in large awards or set-

---

**4.** In 1988, by American Honda's own estimate, some 7.5 million riders were using approximately 2.5 million ATVs nationwide. *See* Affidavit of Merrick F. McCarthy, sworn to on October 17, 1989, Exh. G.

tlements. By the fall of 1987, led by the ATV cases, liability claims against American Honda had pierced, or were on the verge of piercing, GAIC's layer of excess insurance for the 1980 through 1983 policy years. By 1988, ATV losses exceed those for all other Honda products combined. *See* Plaintiff's Memorandum of Law, Exh. A. These losses have resulted in a significant drain on GAIC's layer of insurance, and thus has resulted in GAIC calling on its reinsurers, including Christiana, for indemnification under the facultative certificates.

Christiana has refused to indemnify GAIC for losses on the American Honda account. Christiana alleges that it was not notified of its potential liability in a timely fashion, and that GAIC misrepresented to Christiana at the time of the reinsurance contracts which products were being insured. Additionally, Christiana alleges that by not giving earlier notice of potential liability to it reinsurers, GAIC breached a duty of good faith to those reinsurers. In order to explore fully Christiana's allegations, it is necessary to review the events leading up to GAIC's notification to its reinsurers that their policies would be affected by the ATV losses.

As noted above, the extent of the potential liability problems arising from ATV use began to surface in 1985, with the action by the CPSC and the resulting media attention. Just as the public awareness of the ATV problem was growing, there apparently was knowledge among American Honda's insurers that the ATV losses, along with the expected losses from other Honda products, could well result in major liability for the insurers. In April 1985, Johnson & Higgins, who acted as American Honda's insurance broker, informed GAIC that, given the current rate of loss for the 1979 and 1980 policy years, it was possible that GAIC's layer of insurance could become involved in covering the claimed losses. Plaintiff's Exh. 2. A month later, Johnson & Higgins notified GAIC that existing claims might also involve the 1982 policy year. Plaintiff's Exh. 53. Within GAIC, some concern was expressed during 1985 about the extent of GAIC's possible exposure on it American Honda policies. *See, e.g.,* Plaintiff's Exh. 105i. Johnson & Higgins forwarded at least some case files to GAIC for their review.

Throughout 1986, there was continuous activity within GAIC regarding the American Honda account. *See* Plaintiff's Exh. 115a–115m. Officials within GAIC were aware of the company's potential exposure for one or more policy years. However, it is clear that no one at GAIC knew which policy year would definitely be affected, or when GAIC's insurance layer for any one of those policy years would actually be pierced and GAIC would be required to take over management of any claims. GAIC was receiving updates from Johnson & Higgins, as well as computer runs of claims from the Insurance Company of North America ("INA"), which was the carrier for the excess layer directly below that carried by GAIC. Representatives of American Honda offered to assist GAIC in any review or claims management that GAIC felt would be necessary. Plaintiff's Exh. 115p. It appears, however, that because it was not certain which of GAIC's layers and policy years would be penetrated and which claims, if any, of the ones then existing would be involved in this penetration, GAIC declined American Honda' offer of help at that time.

In November 1986, GAIC was informed by INA that it was possible that INA's layer of insurance for the 1983 policy year would be expended during the following 12 months. Plaintiff's Exh. 115t. That same month, American Honda indicated to GAIC that it was likely that GAIC's layer for at least some years would be penetrated within the next six months. Plaintiff's Exh. 115l. This information apparently led Jerry Runnels ("Runnels"), a vice-president of GAIC in the claims department wrote to a colleague, Robert Adams ("Adams"), a vice-president in the accounting department, that it appeared that GAIC's layer would be penetrated soon for at least two policy years. Plaintiff's Exh. 115u. It is clear from this memo that GAIC did not have a complete picture of their potential liability, or the time-frame in which it

would arise. Runnels stated that he was going to "get a more accurate assessment as soon as possible [so that GAIC can] begin to plan how we are going to handle these cases when the necessity to do so arises." *Id.*

From the documentation before the Court, it is clear that in December 1986 and January 1987, GAIC began to pay significant attention to its American Honda account. In late January 1987, Runnels again wrote to Adams, attaching an internal GAIC report which indicated that, on an incurred basis, GAIC's insurance layer had been pierced for at least three policy years. Plaintiff's Exh. 42. Because of this apparent piercing on an incurred basis, Runnels explained that the claims department was taking a number of steps to prepare to handle claims when they became GAIC's responsibility. The first of those tasks was to conduct an audit of the American Honda claim files to "get a better feel for past and current handling, reserve accuracy, etc." *Id.* Further, Runnels indicated that his department need to "[d]ecide which years we should become actively involved in...." *Id.*

Plaintiff has made much of the fact that GAIC knew, through Runnels, that by early 1987 GAIC's layer of insurance had been penetrated on an incurred basis. There are two ways of calculating losses on an insurance policy: on an incurred basis, and on a paid basis. Incurred losses are losses actually paid plus reserves put in place to cover what are expected losses based on pending claims. Paid losses are just that: losses actually paid. An excess insurer, and thus its reinsurers, are not actually called upon to participate in claims handling and coverage until the underlying levels of insurance have been exceeded on a paid basis. Thus, the fact that INA's and American Honda's figures in 1986 and early 1987 indicated

that GAIC's layer was penetrated on an incurred basis did not mean that GAIC at that point was required to participate in any existing claims. It simply indicated a strong possibility that, should INA's reserve figures prove to be correct, GAIC's layer would eventually be involved. However, it remained at least theoretically possible that GAIC's layer would never actually be called upon to make payments, and it was certainly true that there would be a gap in time between when GAIC's layer was penetrated on an incurred basis and when it would be penetrated on a paid basis.

As 1987 progressed, however, events moved inexorably toward the eventual penetration of GAIC's layer of insurance for at least some policy years. In the spring of 1987, as Runnels had indicated, GAIC undertook an audit of the American Honda account. This review was apparently completed in April 1987, and indicated that GAIC should establish some reserves for at least the 1983 year and notify its reinsurers. Defendant's Memorandum of Law at 19. Soon thereafter, in early May, representatives of GAIC contacted Willcox, the reinsurance intermediary to explain the situation with the American Honda account, and discuss notification of the reinsurers.[5] GAIC's representatives apparently supplied Willcox with the results of the audit, and also discussed the provision of notice to the reinsurers about the imminent exposure for the 1983 policy year. *See* Deposition of Merrick McCarthy ("McCarthy Dep.") at 61–66; Deposition of Peter Hildebrand ("Hildebrand Dep.") at 28–31.

By the time GAIC met with Willcox, Willcox was in the process of winding down its facultative reinsurance operation.[6] Thus, there was a question whether Willcox would be capable of providing initial and on-going notice to GAIC's reinsurers of the

---

5. The reinsurance certificates at issue for all policy years but 1980 included a provision which required that "All communications (including but not limited to notices, ...) shall be transmitted to the ceding carrier or reinsurer through Intermediary [Willcox]." Amended Complaint, Exh B ¶ 15, Exh. C ¶ 15, Exh. D ¶ 16.

6. Indeed, Willcox had notified GAIC in 1984 that it was ceasing operations in the property and casualty area of its facultative reinsurance business. Plaintiff's Exh. 23. Willcox did indicate that it would fulfill its obligations under existing contracts, including those on the reinsurance agreements between Christiana and GAIC.

activity in the American Honda account. GAIC apparently agreed to provide the reinsurers with information regarding the American Honda account. It is not clear, however, whether GAIC entirely absolved Willcox of its contractual obligation to provide notice to the reinsurers based on the material before it. It is clear that Willcox did not provide written notice to any of GAIC's reinsurers.

In a letter dated June 19, 1987, GAIC gave written notice to Christiana and other reinsurers that there was "impending loss activity" in the 1983 policy year. Defendant's Exh. 3. This was the first written notice any reinsurer had received regarding GAIC's American Honda account. A second letter, dated July 9, 1987, provided notice to the reinsurers that GAIC's layer of insurance for the 1982 policy year was also about to be pierced. Defendant's Exh. 4. Meanwhile, on June 29, 1987, GAIC's representatives again met with Willcox and provided more information about the status of the American Honda account. Plaintiff's Exh. 116a. At that meeting, GAIC and Willcox agreed that a large scale meeting should be set up with the reinsurers, "clarifying reporting, informational needs, cash flow, and the like...." *Id.*

Such a meeting was in fact held on August 27, 1987. A representative of Christiana was present at the meeting. The meeting was, the parties agree, extensive, providing the reinsurers with a large volume of material about the American Honda account. The narrative of that meeting indicates its thoroughness. Plaintiff's Exh. 123. Soon after the August 27 meeting, Christiana objected to assuming liability on the American Honda account, based, in part, on an allegation that GAIC did not provide sufficiently timely notice of exposure. GAIC explicitly rejected Christiana's late notice assertion. In a letter dated October 6, 1987, GAIC made a cash call to its reinsurers. That letter indicated that GAIC had been handling cases for American Honda since August 14, 1987. Plaintiff's Exh. 17. On November 23, 1987, Christiana filed the instant action for a declaratory judgment.

Christiana has now moved for summary judgment, asserting that the notice provided to the reinsurers by GAIC was unreasonably late; that the late notice prejudiced Christiana; that GAIC violated a fiduciary responsibility to its reinsurers by not providing earlier notice; and that GAIC materially misrepresented what products, and the risks associated with those products, were covered by the reinsurance contracts. Christiana also moves to amend its complaint should its motion be denied. GAIC cross-moves for summary judgment on the issues of both late notice and misrepresentation.

## DISCUSSION

### A) Standards

Rule 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." " 'Summary judgment is appropriate when, after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party.' " *Horn & Hardart Co. v. Pillsbury Co.*, 888 F.2d 8, 10 (2d Cir.1989), *quoting Murray v. National Broadcasting Co.*, 844 F.2d 988, 992 (2d Cir.), *cert. denied*, 488 U.S. 955, 109 S.Ct. 391, 102 L.Ed.2d 380 (1988).

The substantive law governing the case will identify those facts which are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will probably preclude the entry of summary judgment.... While the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are crucial and which facts are irrelevant that governs." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to deter-

mine whether there does indeed exist a genuine issue for trial." *Id.* at 249, 106 S.Ct. at 2511; *see also R.C. Bigelow, Inc. v. Unilever N.V.,* 867 F.2d 102, 107 (2d Cir.), *cert. denied sub nom. Thomas J. Lipton, Inc. v. R.C. Bigelow, Inc.,* — U.S. —, 110 S.Ct. 64, 107 L.Ed.2d 31 (1989). The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion" and identifying which materials it believes "demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *see also Trebor Sportswear Co. v. Limited Stores, Inc.,* 865 F.2d 506, 511 (2d Cir.1989). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex, supra,* 477 U.S. at 325, 106 S.Ct. at 2554.

Indeed, once a motion for summary judgment is properly made, the burden then shifts to the nonmoving party, which "must set forth facts showing that there is a genuine issue for trial." *Anderson, supra,* 477 U.S. at 250, 106 S.Ct. at 2511. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citations omitted).

*B) Governing Law*

■ The parties agree that New York law applies to this action. Plaintiff's Memorandum of Law at 6, Defendant's Memorandum of Law at 1 n. 1. The reinsurance contracts were negotiated, issued, and made in New York by a New York reinsurance company. Additionally, New York would be the place of performance under the contracts. These are sufficient contacts to justify the application of New York law under the New York choice of law doctrine. *See Klaxon Co. v. Stentor Elec.*

*Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Berman v. Hertz Corp.,* 127 A.D.2d 809, 511 N.Y.S.2d 938 (2d Dep't 1987); *Colonial Penn Insurance Co. v. Minkoff,* 40 A.D.2d 819, 338 N.Y.S.2d 444 (1972), *aff'd,* 33 N.Y.2d 542, 347 N.Y.S.2d 437, 301 N.E.2d 424 (1973).

*C) Notice to Reinsurers*

■ New York law strongly supports prompt notice clauses in primary insurance contracts. *Travelers Ins. Co. v. Buffalo Reinsurance Co.,* 735 F.Supp. 492, 498 (S.D.N.Y.1990) [7] *(citing, inter alia, Security Mutual Ins. Co. v. Acker–Fitzsimons Corp.,* 31 N.Y.2d 436, 441, 340 N.Y.S.2d 902, 906, 293 N.E.2d 76, 79 (1972); *Power Authority of New York v. Westinghouse Elec. Corp.,* 117 A.D.2d 336, 339, 502 N.Y. S.2d 420, 422 (1st Dep't 1986); *Jenkins v. Burgos,* 99 A.D.2d 217, 219–20, 472 N.Y. S.2d 373, 375 (1st Dep't 1984)). Failure by an insured to meet a contractual notice requirement excuses an insurer's performance, regardless of whether the insurer was prejudiced by the late notice. *See, e.g., Security Mutual Ins., supra,* 31 N.Y.2d at 440, 340 N.Y.S.2d at 905, 293 N.E.2d at 78. An insured's late notice may be excused in certain limited cases. "The reasonableness of a particular insured's delay in providing notice is ordinarily a question of fact reserved for trial. In the absence of a reasonable excuse or mitigating factor for the delay, however, the timeliness of the insured's notice may be disposed of as a matter of law in advance of trial. It is noteworthy that even relatively short periods of delay repeatedly have been found to be unreasonable as a matter of law in the absence of a reasonable excuse or mitigating factor." *Travelers, supra,* 735 F.Supp. at 500. Thus, if plaintiff in the instant action were a primary insurer and defendant were an insured, the sole questions before the Court would be whether the notice provided to plaintiff was timely, and whether defendant had put forth a reason-

---

7. This opinion was vacated upon a motion for reargument. *Travelers Ins. Co. v. Buffalo Reinsurance Co.,* 739 F.Supp. 209 (S.D.N.Y.1990). However, this new opinion did not change the Court's analysis of the "reasonable notice" standard.

able excuse or mitigating factor justifying and untimeliness.

However, this case is more complex than the normal late notice action. This action involves a contract between an insurer and a reinsurer, where the underlying insurance is an excess, rather than primary, policy, and the liability at issue arose from an unexpected liability crisis. Each of these factors has an impact on the Court's analysis of the "prompt notice" provision in the reinsurance contract and of GAIC's actions in relation to that provision.

There is a remarkable absence of case law in New York on the relationship between reinsurers and reinsured. In particular, it is far from clear how New York courts would apply the law of prompt notice in primary insurance cases to cases involving reinsurance. It is not clear whether "prompt notice" has the same meaning in the reinsurance context as it does in the primary insurance context. It is also not clear whether prejudice must be shown by the reinsurer, even though a primary insurer enforcing a notice provision is not required to show prejudice. It appears that only one court in this state has confronted the issue of notice in the reinsurance context. That court decided that the issues in reinsurance were sufficiently distinguishable from those in primary insurance to justify a different notice rule, which requires a showing of prejudice by the reinsurer before that reinsurer is excused from its obligations. *General Ins. Co. of Trieste & Venice v. Nutmeg Ins. Co.*, No. 6213–85 (Sup.Ct.N.Y.Co., July 24, 1987), slip op. at 6.

At least one court in this District has rejected the holding of *General Insurance.* In *Travelers, supra,* Judge John M. Cannella explicitly declined to follow the analysis of the New York court. 735 F.Supp. at 498 n. 4. Though Judge Cannella has since vacated that opinion on a motion for reargument, *Travelers Ins. Co. v. Buffalo Reinsurance Co.,* 739 F.Supp. 209 (S.D.N.Y. 1990) ("June 22, 1990 Order"), it is clear from his recent opinion that Judge Cannel-

la has not adjusted his view that a reinsurer need not show prejudice where notice has been provided in an untimely fashion. June 22, 1990 Order, 739 F.Supp. at 213 n. 4.

More·recently, another member of the Court, Judge Robert W. Sweet, implicitly disagreed with Judge Cannella's rejection of the *General Insurance* case. Judge Sweet, in denying a reinsurer's motion for summary judgment based on allegedly late notice, undertook a review of the existing case law and of the differences between primary insurance and reinsurance. Based on that review, Judge Sweet found that "it cannot be predicted with confidence that a New York court would regard the circumstances of reinsurance industry custom and practice as irrelevant to the reasonable notice question presented here, or hold as a matter of law that the legal doctrines enunciated in the primary insurance context—in particular the treatment of notice of loss provisions as conditions precedent—should apply with equal force to contracts of reinsurance such as this one." *Unigard Security Ins. Co., Inc. v. North River Ins. Co.,* 88 Civ. 0789 (RWS), slip op. at 25, 1990 WL 102879 (S.D.N.Y. July 12, 1990).

*Unigard* involved a notice provision almost identical to that in the case at bar.[8] Judge Sweet focused on the problem of determining at what point an excess insurer should be required to give notice to its reinsurers. Judge Sweet noted that an excess insurer obtains numerous pieces of information over time which indicate that its layer of insurance may be pierced, up to the point when the underlying layer is actually exhausted and the insurer assumes responsibility for outstanding claims. "[I]t is difficult to state, and the notice provision of the [reinsurance] contract provides no precise yardstick by which to measure, at what single and certain point on that continuum a reasonable reinsured would conclude there was a level of risk of exposure adequate to require notice." *Unigard, supra,* slip op. at 20.

---

**8.** In *Unigard,* the notice provision stated in part: "Prompt notice shall be given ... of any occur-

rence or accident which appears likely to involve this reinsurance."

In the instant case, Christiana asserts that notice should have been given as early as 1985 when the publicity regarding ATVs indicated that a major liability crisis was brewing for all Honda insurers. Christiana points to the *20/20* broadcast, the CPSC reports, and deposition testimony from GAIC employees to show that GAIC was aware by late 1985 that there was a possibility that its layer of insurance would become involved at some point due to the number of serious ATV accidents. If the Court were to find notice unnecessary in 1985, Christiana asserts that notice by late 1986 should be required, when GAIC received information from INA that its layer of insurance had been exhausted on an incurred basis. Finally, Christiana claims that notice at the very latest should have been provided in April 1987 when, after completion of the audit of the American Honda account, it became clear to GAIC that the piercing of its layer on a paid basis was imminent.

In determining when notice should have been given to the reinsurers, both Judge Sweet and Judge Cannella have held that it is appropriate to consider the custom and practice in the reinsurance industry to determine when formal notice is required. While custom and practice evidence is considered extrinsic and thus inadmissable to contradict clear and unambiguous provisions, *see Hunt, Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277–78 (2d Cir.1989), where provisions are ambiguous as to their requirements, such extrinsic evidence would be appropriate, and, indeed, necessary to assist the Court in providing a proper interpretation. June 22, 1990 Order, 739 F.Supp. at 212. The notice provision currently before the Court is ambiguous in its requirements for notice. At least two terms within the notice provision are undefined in the contract, and as a matter of law in the reinsurance context. First, it is unclear what is meant by "prompt notice." Second, the phrase "any occurrence or accident which appears likely to involve this reinsurance" is also ambiguous in the reinsurance context. Defendant has focused on the second phrase in examining GAIC's actions. Defendant asserts that

"likely to involve this reinsurance" means that the insurer is not required to provide notice to its reinsurers until it is completely clear that the insurer's layer will be pierced.

In *Travelers*, there was evidence placed before the Court that it is not unusual for a substantial time to pass from notification of the intermediary by the ceding insurer of impending activity and the intermediary's subsequent notification of the reinsurers. June 22, 1990 Order, 739 F.Supp. at 212. In *Unigard*, there was evidence that, even after a decision to give notice is made, it is not unusual for it to take six months for the insurer to actually notify the reinsurer. *Unigard, supra*, slip op. at 21. However, in both *Travelers* and *Unigard*, while the Court found this evidence of custom and practice to be relevant to the determination of whether the notice given was violative of the "prompt notice" provision, neither Court was willing to rest on such evidence. Both found that such expert testimony required review by a finder of fact in open Court before it could be given full credence. Thus, both Judge Cannella and Judge Sweet denied summary judgment for the reinsurers on the basis that the ceding insurer had raised a significant question of material fact for trial.

■ After reviewing the existing case law and applying it to the relationship between an excess insurer and its reinsurer, the Court finds that a reinsurer must show prejudice from late notice before it can be excused from its liability under the reinsurance contract. The policy considerations underlying New York's rule that a primary insurer need not demonstrate prejudice when an insured breaches a notice provision are not present in a reinsurance contract. Reinsurers have no duty to defend claims, nor is the potential staleness of a claim as significant a concern to a reinsurer as it is to a primary insurer. Thus, reinsurers must show prejudice from the allegedly late notice in order to avoid liability under a reinsurance contract.

■ The threshold question for Court remains whether the notice provided by

GAIC was sufficient under the notice provision. GAIC admits that actual written notice of imminent activity in GAIC's layer was not given until June 1987.[9] Judge Sweet explained that the expert opinion before him indicated that notice was normally not required to be given to a reinsurer by an excess insurer until the time when the excess insurer sets reserves on the reinsured policy. *Unigard, supra,* slip op. at 21. Judge Sweet further noted that the evidence before him indicated that notice to the reinsurer was never required until the excess insurer was itself on notice that the underlying limits were about to be exhausted. *Id.* Based on this analysis, in the instant case, GAIC would not be required to give notice until April 1987, the time when it completed the audit, and informed Willcox of the imminence of liability.

The question remains whether the gap between April 1987 and June 1987, when GAIC gave formal written notice of the piercing of GAIC's layer for the 1983 policy year, was violative of the prompt notice provision. However, as indicated above, both Judge Sweet in *Unigard* and Judge Cannella in *Travelers* have found that there is a material question of fact as to what period of time between when notice should be given and the actual notice is acceptable in the reinsurance industry. That same question arises here. The Court cannot find that the notice to Willcox in May 1987 was sufficient notice to the reinsurers, since it appears that Willcox expressed its probable inability to handle the American Honda account. Further, it appears that GAIC agreed with Willcox that GAIC would be the party to inform the reinsurers, not Willcox. Nor can the Court find that the delay from April 1987 to June

1987 was acceptable as a matter of law. GAIC has not provided an adequate explanation for the delay between its notification of Willcox in May 1987 and its subsequent notification in June 1987 of the reinsurers.

Additionally, the Court does not find that notice to the reinsurers was required at any time prior to April 1987. Upon review of the record, the Court agrees with GAIC that, up to the time of the completion of the audit in April 1987, actual penetration of GAIC's layers, while likely, was far from certain, and the timing of such penetration was speculative. The Court believes that Judge Sweet's finding that notice should be required at the time reserves are set is sound. Requiring earlier notice would place an excess insurer in a position of speculation, and require it to expend substantial resources in monitoring the underlying layer of insurance. Only when it is sufficiently certain that the excess insurer's layer will be pierced on a paid basis, so that the excess insurer sets reserves for probable claims, should the excess insurer be required to inform its reinsurers that their liability is likely to be affected.[10]

Even absent this logical standard, the Court does not find that the notice provision in the case at bar would have required notice at a date earlier than May 1987. It is clear from the record before the Court that GAIC knew from at least the second half of 1986 that it was likely that its layer of insurance would be pierced for at least some policy years. However, until completion of the audit, it was uncertain when GAIC's layer would be pierced in which policy years, and which of the hundreds of ATV and other claims were likely to become GAIC's responsibility. Some certain-

---

**9.** Christiana claims that it never received the June 19, 1987 letter addressed to it from GAIC, indicating impending activity in GAIC's layer for the 1983 policy year. *See* Defendant's Exh. 3; Plaintiff's Exh. 17. However, there is included in plaintiff's exhibits an undated post office return receipt indicating acceptance of what appears to be the June 19, 1987 letter by an employee of plaintiff. Plaintiff's Exh. 17. While the Court finds this undated return receipt inconclusive on the present record, the receipt's existence casts doubt on plaintiff's assertion of non-receipt.

**10.** Even if an excess insurer's layer is pierced, it is never certain that an individual reinsurer will be called upon to indemnify the insurer. As explained above, facultative reinsurance is usually spread among a number of reinsurers, and the excess insurer usually retains a portion of the risk itself. Thus, the individual reinsurer will often only be called upon when its particular reinsurance level is breached, depending on the language of the reinsurance contract at issue.

ty of the timing and extent of loss should be present before the excess insurer is required to indicate the probability of involvement to the reinsurers.[11]

The Court thus finds that a reinsurer must show prejudice from late notice before the reinsurer may be relieved of liability. Further, the Court finds that the appropriate date for notice to the reinsurers in the instant case was April 1987. Finally, the Court finds there to be a genuine issue of material fact as to whether the actual notice given to the reinsurers in June 1987 was sufficient given the custom and practice in the reinsurance industry.[12] Accordingly, the parties' cross-motions for summary judgment on this issue of late notice is denied.[13]

### D) GAIC's Duty to Christiana

█ Christiana asserts that a reinsured has a fiduciary duty to act with the utmost good faith, and that that duty was breached by GAIC. Specifically, Christiana claims that GAIC took a number of actions prior to 1987 to avoid or prevent notice to its reinsurers, that GAIC failed to investigate adequately the extent of possible liability, despite indications of such liability; and, finally, that GAIC failed to provide sufficient information to its reinsurers at the August 1987 meeting.

The Court must first examine the nature of the relationship between reinsurers and ceding insurers. Plaintiff has not cited a single case that indicates clearly that a ceding insurer owes a fiduciary duty to it facultative reinsurer. There is law, however, that indicates that a ceding insurer owes a non-fiduciary duty of good faith to its reinsurer. *Hare & Chase, Inc. v. Na-*

*tional Surety Co.,* 60 F.2d 909, 911 (2d Cir.), *cert. denied,* 287 U.S. 662, 53 S.Ct. 222, 77 L.Ed. 572 (1932). However, nothing in the cases cited by the parties, or discovered by the Court, indicates that the duty between a ceding insurer and a facultative reinsurer rises to the level of being a fiduciary one.

Plaintiff has made a variety of significant claims against defendant that, if fully supported on the record, could be found to create a ground for recision. However, a review of the record indicates that plaintiff is attempting to create obligations between the parties that were not imposed by the contracts between them, nor by any law governing their relationship. There is nothing in the contracts or in the law involving reinsurance which indicates that GAIC was obligated to do more than it did to inform its reinsurers or to investigate its potential liability. GAIC's admittedly conscious decision not to give earlier notice is not, as plaintiff would have the Court believe, an indication of an intent to deceive. Nothing in the voluminous record before the Court clearly indicates that defendant conspired in any way to deceive its reinsurers, or to explicitly withhold vital information from them. More importantly, Christiana did not contract for some of the obligations that it would now place on GAIC. There is nothing in the contracts to indicate that GAIC was required to provide constant updating of the status of GAIC's excess insurance account. Nor was GAIC required by the contract to identify and monitor individual claims that might become GAIC's responsibility well before

11. The Court finds Christiana's assertion that GAIC should have given notice to its reinsurers in 1985 to be without merit. The fact that the CPSC issued a warning and a proposed rule regarding ATVs does not, in and of itself, indicate potential liability. Further, the broadcast of television news reports on a few accident *does not create notice to an excess insurer that its layer will likely become involved at some future date.*

12. The Court does not find that the notice given to Willcox in May 1987 sufficed as notice to the reinsurers, despite the contract provision indi-

cating that communication should be through the intermediary. GAIC's representatives admit that they agreed that GAIC, not Willcox, should actually notify the reinsurers. *See* McCarthy Dep. at 61. Thus, notice to Willcox could not be said to accomplish notice to the reinsurers.

13. As the Court finds there to be a genuine issue of material fact as to whether the notice given was sufficient, it need not reach the issue of whether Christiana was prejudiced at this time, as such prejudice need only be demonstrated if the notice was insufficient.

GAIC's layer was actually pierced.[14] Finally, the Court cannot find that GAIC withheld information from its reinsurers at the August 1987 meeting, which it was required to provide under its contracts with Christiana. GAIC provided the reinsurers with extensive information regarding the American Honda account, and the outstanding claims which would affect those layers of insurance for which the reinsurers were liable. While Christiana may have desired more information both before August 27, 1987, and at the meeting held on that date, the Court does not find that GAIC had any duty, contractual or otherwise, to provide more information than it did.[15]

### E) Misrepresentation

■ The parties agree that recision may be granted where the reinsured makes a material misrepresentation to the reinsurer. *See, e.g., Royal Indemnity Co. v. Preferred Acci. Ins. Co.*, 268 N.Y. 566, 198 N.E. 407 (1935). The issues before the Court is whether any misrepresentations were made to plaintiff, and, if misrepresentations are found to exist, whether those misrepresentations are material so as to warrant recision. At the time Christiana entered into its reinsurance certificates with GAIC, ATVs were not independently mentioned as among the risks included in the American Honda account. Through 1984, ATVs were placed in sales and loss figures along with power equipment, or with motorcycles, both of which frequently appeared as categories of products covered by GAIC's excess insurance policy with American Honda. It is undisputed that American Honda, GAIC, and Willcox did not begin to list ATVs as a separate category of products until 1985, after Christiana had ceased to assume additional reinsurance responsibilities on the American Honda account.

GAIC does not deny that Christiana was never explicitly informed that ATVs were a part of the risk it was reinsuring. GAIC does claim, however, that recision in this instance would be inappropriate because GAIC did not knowingly withhold any information within its possession from Christiana. GAIC further asserts that the failure to disclose ATVs as a separate risk was not material at the time Christiana entered into the reinsurance contracts at issue.

Upon review of the applicable law and facts, the Court finds that the question of the materiality of the alleged misrepresentations is critical to the determination of whether recision is appropriate in this instance. "To be material, the fact must be 'something which would have controlled the underwriter's decision' to accept the risk." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 13 (2d Cir.1986) (*quoting Puritan Ins. Co. v. Eagle S.S. Co. S.A.*, 779 F.2d 866, 870–71 (2d Cir.1985)), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). This is not a decision to be made in hindsight, but should be based on the position of the parties at the time of contracting. Thus, succinctly put, the question for the Court is whether Christiana would have refused to reinsure GAIC's American Honda risk for the policy years 1980 through 1983 if it had known at the time each of those contracts was signed that ATVs were part of the risk being insured by GAIC, and thus reinsured by Christiana.

The Court has carefully reviewed the record, and finds that Christiana cannot now support its assertion that this information was material. The Court has no doubt that by late 1985, information that ATVs were included in the proposed coverage was material to any risk determination. By 1985, both CPSC and the national media had publicized what was then a growing risk posed by ATVs, and a then-increasing number of ATV-related injuries. The

---

**14.** The Court also notes in this regard that Christiana was provided loss data at the time of its annual renewals of its facultative insurance policies during the period of 1980 to 1984. To the limited extent that ATV losses were beginning to build during that period, Christiana received actual notice of increasing losses.

**15.** Christiana has also made an application for attorneys' fees. Since this application assumes a finding by the Court that defendant has breached a duty to plaintiff, it must be denied at this time.

record indicates that while there were some reports of ATV-related injuries in the years 1980 through 1983 when Christiana entered into the reinsurance contracts at issue, those reports did not suggest that ATVs would develop into a substantial liability problem.

At the very least, the affidavit and certification of Christiana's reinsurance underwriter creates a serious question of fact as to whether the listing of ATVs as a covered product would have changed Christiana's decision to enter into the reinsurance contracts with GAIC. Specifically, the certification of Arthur Bingay, Christiana's underwriter, indicates that the inclusion of ATVs might have caused him to ask some questions about the product. Certification of Arthur Bingay, dated July 6, 1989, ¶ 5. However, as his subsequent affidavit makes clear, the simple inclusion of ATVs on the list of covered products would not have necessarily resulted in the rejection by Christiana of the proposed reinsurance contracts. Affidavit of Arthur E. Bingay, sworn to January 10, 1990, ¶¶ 5–7. That decision would depend on the risk associated with that product. The Court cannot find on the current record that the information available on ATV liability in the period from 1980 through 1983 would, if revealed to Christiana at the time of contracting, would have materially affected Christiana's decision to enter into the reinsurance contracts with GAIC. Accordingly, Christiana's motion for summary judgment on the issue of misrepresentation is denied. Similarly, the Court cannot find on the record before it that information regarding the presence of ATVs was definitely immaterial as a matter of law. However, GAIC's motion for summary judgment on this issue can only be finally resolved after examination of the issue of knowledge.

Christiana asserts that the reason for omission of a material fact to an insurer by an insured (and, by analogy, to a reinsurer by a reinsured) is not an appropriate inquiry in deciding whether recision is appropriate. Christiana correctly notes that in 1837 New York's Supreme Court of Judicature stated, "[W]hether the omission was the result of mistake or design, was not an important inquiry." *New York Bowery Fire Ins. Co. v. New York Fire Ins. Co.*, 17 Wend. 359, 368 (1837); *see also Geer v. Union Mutual Life Ins. Co.*, 273 N.Y. 261, 271, 7 N.E.2d 125 (1937). Thus, it is clear that if an insured possesses material information which is not passed on to the insurer, that failure to supply the information, whether intentional or innocent, is grounds for recision.

█ GAIC does not claim, however, that its failure to provide information about ATVs at the time of contracting was an innocent failure to provide information within its knowledge. GAIC insists instead that it simply had no material information regarding ATVs. Christiana has not cited, and the Court cannot find, any case law indicating that the failure to provide material information, unknown to the insured (or reinsured) at the time of contracting is a ground for recision. Thus, GAIC is correct that recision cannot be granted for GAIC's failure to reveal information not in its possession at the time of contracting.

But this legal conclusion does not lead to a grant of summary judgment for GAIC. There is at least some evidence that GAIC was aware during the contracting period that ATVs were among the products its was insuring. Further, there is evidence to indicate that GAIC may have had in its possession during at least some of the contracting years some preliminary information regarding ATV losses. While, as discussed above, the Court does not now decide whether any or all of this information was material at the time of contracting, if it were, it remains unresolved whether GAIC had knowledge of it at that time. Thus, GAIC's cross-motion for summary judgment on the issue of material misrepresentation is denied.

*F) Motion to Amend Complaint*

█ In the alternative to its motion for summary judgment, plaintiff has moved to amend further its complaint. Fed.R.Civ.P. 15(a) "sets forth a policy in favor of granting leave to amend, stating that 'leave to amend shall be freely given

when justice so requires.' " *Jaser v. New York Property Insurance Underwriting Ass'n*, 815 F.2d 240, 243 (2d Cir.1987). A motion to amend should be denied only for good reason such as " 'undue delay, bad faith, futility of amendment, and perhaps, most important, the resulting prejudice to the opposing party.' " *Richardson Greenshields Secur., Inc. v. Mui–Hin Lau*, 825 F.2d 647, 653 n. 6 (2d Cir.1987), *quoting State Teachers Retirement Board v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981); *Tokio Marine & Fire Ins. Co. v. Employers Ins. of Wausau*, 786 F.2d 101, 103 (2d Cir.1986), *citing Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). Mere delay alone will not suffice as a basis for the district court to deny the right to amend. *Richardson Greenshields, supra*, 825 F.2d at 653 n. 6. Parties have been permitted to assert new claims *long after they acquired the facts necessary to support such claims, see, e.g., Green v. Wolf Corp.*, 50 F.R.D. 220, 223 (S.D.N.Y.1970), and have even been permitted to amend a complaint on the eve of trial. *See Hanlin v. Mitchelson*, 794 F.2d 834 (2d Cir.1986).

■ Defendant has objected strenuously to plaintiff's motion to amend further its complaint on the grounds that plaintiff failed to provide, at the time of its motion, either a proposed amended complaint, or at least a draft of the proposed amendments. This Court has consistently urged parties seeking to amend their complaints to first provide opposing counsel with a copy of the proposed amendments. On March 19, 1990, after all other papers on these motions had been received, the Court, and presumably defendant, received a proposed amended complaint from plaintiff.[16] The Court agrees with defendant that plaintiff's failure to file a proposed amendment at the time of its motion, or at the latest after defendant indicated it desired a copy of such a proposed amendment, was not within the liberal spirit of Rule 15.

Nonetheless, the Court cannot find that defendant will be so unduly prejudiced by the proposed amendment as to require the Court to deny plaintiff's motion to amend. Thus, plaintiff's motion to further amend its complaint is granted. The Court will refer this action back to United States Magistrate Naomi Reice Buchwald for further pre-trial supervision, should either party require additional discovery due to these amendments to the plaintiff's pleadings.

*G) Discovery Dispute*

■ In what appears to be a separate motion, plaintiff has submitted the affidavit of one of its counsel who requests the Court to reconsider a discovery ruling made by Magistrate Buchwald during the course of her pre-trial supervision of this action. *See* Affidavit of James A. Plaisted, Esq., sworn to on March 19, 1990, ¶ 2. Fed.R.Civ.P. 72 and 28 U.S.C. § 636 provide the mechanism whereby a party may challenge the ruling of a Magistrate. The Court will not entertain a challenge to a Magistrate's ruling which is, like the one now before the Court, brought in a manner other than that prescribed by the Federal Rules and the applicable statute, particularly in an action involving experienced counsel. Accordingly, to the extent plaintiff has moved to have this Court reconsider a ruling of Magistrate Buchwald, that motion is denied.

## CONCLUSION

The parties' cross-motions for summary judgment are denied.

Plaintiff's motion to further amend its complaint is granted. Plaintiff's second amended complaint shall be filed within twenty (20) days of this order.

Plaintiff's motion for reconsideration of a discovery ruling of Magistrate Naomi Reice Buchwald is denied.

This action is referred to Magistrate Buchwald for further pre-trial supervision. The parties shall report to the Court and to the Magistrate within twenty (20) days of the filing of the second amended complaint whether further discovery shall be re-

---

**16.** The Court notes that an amended complaint was filed in this action in 1988. Thus, any pleading filed by plaintiff after the instant motion would be a second amended complaint.

quired. Should no such discovery be needed, the Magistrate shall so indicate to this Court, and plaintiff shall contact the Court to arrange a final pre-trial conference in this matter.

SO ORDERED.