CHRISTIANIA GENERAL INSURANCE
CORPORATION OF NEW YORK,
Plaintiff–Appellant,

v.

GREAT AMERICAN INSURANCE
COMPANY, Defendant–
Appellee.

No. 862, Docket 91–7912.

United States Court of Appeals,
Second Circuit.

Argued Feb. 3, 1992.

Decided Sept. 3, 1992.

James A. Plaisted, Roseland, N.J. (Stuart A. Smith, Donald A. Emeigh, Jr., Walder, Sondak, Berkeley & Brogan, P.A., Roseland, N.J., of counsel), for plaintiff-appellant.

Thomas R. Newman, New York City (Thomas M. Bower, Barry T. Bassis, Newman & Bower, P.C., New York City, of counsel), for defendant-appellee.

Before OAKES, Chief Judge,* MESKILL and CARDAMONE, Circuit Judges.

CARDAMONE, Circuit Judge:

This appeal is from a grant of summary judgment that dismissed a declaratory judgment action brought in the United States District Court for the Southern District of New York (Leisure, J.) by a reinsurer seeking a declaration that it be relieved of indemnifying its reinsured because the latter failed to provide it with prompt notice of claims. Plaintiff insists that defendant had a duty to warn of the great exposure it had with regard to accidents involving all-terrain vehicles (ATVs) and that defendant put off, hesitated, and delayed communicating this information. When defendant finally gave notice, plaintiff thinks defendant hemmed and hawed so that the information it received was inaccurate.

## BACKGROUND

Great American Insurance Co. (Great American or defendant) provided excess, or umbrella, products liability insurance to American Honda Motor Co. (Honda), the wholly-owned American subsidiary of a leading Japanese automobile manufacturer. Excess insurance is designed to provide high limits of coverage to guard against catastrophic loss. See 3 Dunham, New York Insurance Law § 39.01[1] (1992) (Dunham). Great American was the third level provider of excess insurance to Honda for the policy years 1980 to 1983 (covering September 1980 to October 1984), responsible for losses in excess of $15, 15, 17 and 18 million for each policy year, for amounts up to $10, 10, 10 and 7 million, respectively.

Just as insurance is designed to distribute risk among those participating in a certain activity, so too is reinsurance. See R. Keeton, Insurance Law, at 7 (1971) (Keeton). Thus, when an insurer wishes to transfer some of the risk it has undertaken under its policy, it "cedes" a certain portion of that risk to another insurance company—the reinsurer. See Colonial Am. Life Ins. Co. v. Commissioner, 491 U.S. 244, 246-47, 109 S.Ct. 2408, 2411, 105 L.Ed.2d 199 (1989); People ex rel. Sea Ins. Co. v. Graves, 274 N.Y. 312, 315, 8 N.E.2d 872 (1937). Simply put, "[r]einsurance is a contract by which one insurer insures the risks of another insurer." People ex rel. Continental Ins. Co. v. Miller, 177 N.Y. 515, 521, 70 N.E. 10 (1904). There are two types of reinsurance, facultative and treaty. Treaty reinsurance obligates the reinsurer to accept in advance a portion of certain types of risks that the ceding company underwrites. Facultative reinsurance covers only a particular risk or a portion of it, which the reinsurer is free to accept or not. See Matter of Midland Ins. Co., 79 N.Y.2d 253, 258, 582 N.Y.S.2d 58, 590 N.E.2d 1186 (1992); Sumitomo Marine & Fire Ins. Co., Ltd. v. Cologne Reinsurance Co. of Am., 75 N.Y.2d 295, 301, 552 N.Y.S.2d 891, 552 N.E.2d 139 (1990).

Great American reinsured a portion of its Honda excess insurance policy under facultative reinsurance certificates with plaintiff Christiania General Insurance Corporation of New York (Christiania or plaintiff). A reinsurance contract is essentially a contract of indemnity, see Graves, 274 N.Y. at 315, 8 N.E.2d 872, and by the terms of the agreements Christiania was obligated to indemnify Great American under the four policies in question up to a total of $3 million. In each policy year Great American retained $250,000 of the risk, and the remainder of the $33 million exposure was reinsured with other companies. Each of the facultative certificates entered into between Great American and Christiania contained a "prompt notice" and "right to as-

---

* After oral argument but before this opinion was drafted, then Chief Judge Oakes became a Senior Judge, and then Judge Meskill became Chief Judge of the Second Circuit.

sociate" clause fairly typical of reinsurance contracts:

> Prompt notice shall be given by [Great American] to [Christiania] of any occurrence or accident which appears likely to involve this reinsurance and ... [Christiania] shall ... have the right and be given the opportunity to associate with [Great American] ... in the defense and control of any claim, suit or proceeding which may involve this reinsurance ...

The Honda policies reinsured contained both "per occurrence" and "aggregate" limits. Hence, the reinsurers could be called upon to indemnify for a single loss to the extent it exceeded Great American's underlying layers or for losses which, in the aggregate, exceeded the underlying layers for a particular policy year.

The principal question presented on this appeal is whether Great American satisfied its obligation to provide Christiania with "prompt notice ... of any occurrence or accident which appear[ed] likely to involve [the parties'] reinsurance." We think there are genuine material factual disputes that must be resolved before this question may be answered, and therefore reverse the district court's grant of summary judgment.

## FACTS

Among the products distributed by Honda were ATVs. The significant potential exposure stemming from ATV use was first suggested in 1985 when the Consumer Products Safety Commission issued a proposed rule as a result of the increasing number of serious injuries associated with them, and ABC News' program 20/20 aired a report detailing the risks posed by ATVs. In April of 1985, Johnson & Higgins (J & H), Honda's insurance broker, notified Great American of "the possibility that your policy for each of [the 1979 and 1980] policy years may become involved." A month later, defendant was similarly notified by J & H concerning a particular claim involving the 1982 policy year. In October 1985 J & H sent another memo to Great American concerning the 1979 and 1980 policy years, warning defendant's claims manager Richard Andolina that "it is certainly possible [the] liability coverage [of the Insurance Company of North America (INA), the excess insurance carrier for the layer immediately below Great American] for each of the policy periods ... may be exhausted. Therefore your coverage would come into operation to protect the interests of [Honda]." Handwritten on the bottom of this memo is the following:

1. Verify accuracy of past claim payments to exhaust INA's coverage

. . . . .

4. Determine identity of next excess layer above us

5. Identify application of our treaty reinsurance & place on notice

. . . . .

10. Any facultative reinsurance for us?

The often extremely serious personal injury claims being brought against Honda as a result of ATV accidents continued to mount and by 1986—though not certain which policy year would definitely be affected or when—Great American officials knew of their potential exposure for one or more policy years. The company was receiving continual updates from J & H and computer runs of claims from INA. A handwritten May 1986 memo prepared by Jerry Runnels, defendant's vice-president of claims, asks "Have reinsurers ever been put on notice of potential exposure? Send copies of latest loss runs and report." A June 1986 Runnels report concluded that "we have [i]mminent exposure to our layers of coverage ... for the policy years ... 1980 to 1981, and 1982 to 1983." The memo continued, "we will have to decide how to notify our reinsurers and which reinsurers should be notified at this time."

In November of 1986 INA informed defendant with respect to the 1983 policy year that "[a]t the present time, we would anticipate that our policy will be fully expended within the next 12 months or possibly sooner," and suggested Great American "make the necessary arrangements to become familiar with this policy year in the near future." That same month Honda notified defendant, as reflected in defendant's internal memo, "that they [Honda]

are going through aggregate layers of coverage quickly and we are going to be involved rather soon, e.g. next 6 months on at least some of the years." Figures from Honda and INA in late 1986 and early 1987 indicated defendant's layer was pierced on an incurred basis, that is to say, the total of losses actually paid plus reserves representing expected losses exceeded INA's liability limits. A January 1987 report prepared by Runnels echoed this conclusion: "on an incurred basis we are already into our layer of coverage on 3 of the [1977–1986] policy years and with the probability of 2 others also piercing our coverage."

In the spring of 1987 Great American undertook an audit of the Honda account which, when completed in April 1987, indicated that it should establish reserves for at least the 1983 policy year and notify its reinsurers. In May 1987 defendant provided Willcox, its broker for the Christiania reinsurance certificates, with the results of the audit. Because Willcox was in the process of shutting down its facultative reinsurance operation, Great American agreed to provide notice to its reinsurers itself.

By letter dated June 19, 1987—which Christiania says it never received, the district court made no finding on this disputed point—defendant notified Christiania of "impending loss activity involving" plaintiff's reinsurance for the 1983 policy year. The letter reported that as of June 10, 1987 there remained $1.25 million in coverage under INA's layer and, considering the rate of loss payments, "the remaining coverage will be exhausted within the next 60 days. This will then bring about the active involvement of [both defendant and plaintiff]." By letter dated July 9, 1987 Christiania was notified similarly with respect to the 1982 policy year.

Great American began handling cases for Honda under the 1983 policy year on August 14, 1987 and orchestrated a meeting with all of its reinsurers on August 27, 1987 to provide them with the detailed information concerning the Honda account and particular claims garnered from the audit. Shortly thereafter Christiania informed defendant that it would not indemnify for losses on the Honda policy because of late notice. By the fall of 1987 liability claims against Honda had pierced, or were on the verge of piercing—on a paid, as opposed to incurred, basis—Great American's layer for the 1980–1983 policy years. On October 6, 1987 it made a cash call on its reinsurers.

Christiania thereupon filed the instant declaratory judgment action on November 23, 1987 seeking a declaration that it was absolved of its indemnification obligations under its reinsurance certificates because defendant had not satisfied the prompt notice requirement or, alternatively, had misrepresented or concealed the risks insured, thereby entitling Christiania to rescind the agreements. In addition, Christiania asserted that defendant's "lack of candor" concerning the information provided at the August 27 meeting and "conscious withholding" of notice were actionable as violative of the "fiduciary" duty defendant owed it to act with the utmost good faith.

After discovery, the parties cross-moved for summary judgment. In an opinion dated August 9, 1990 the district court denied the motions based on lack of prompt notice and misrepresentation and dismissed Christiania's action alleging defendant's breach of duty. See 745 F.Supp. 150 (S.D.N.Y. 1990). On the issue of timely notice, the district court held that Great American's duty to provide notice accrued in April of 1987, but denied summary judgment because there was a genuine issue of material fact as to whether the notice provided in June 1987 was sufficiently prompt. See id. at 161. As to defendant's alleged breach of duty, the district court concluded that because it had no duty to provide notice prior to April 1987 and since full disclosure was made at the August 27 meeting, no claim could be proven concerning the adequacy of the notice provided. See id. at 161–62. On the misrepresentation claim, the trial court found genuine issues of material fact concerning whether the risk posed by ATVs was material at the time of contracting and whether defendant then had knowledge of that risk. See id. at 163.

Christiania filed a second amended complaint that was dismissed on June 6, 1991. It conceded it could not demonstrate it had suffered any prejudice as a result of the de`ay in providing notice from April to June 1987, and the amended complaint was found deficient as to the misrepresentation claim for failure to satisfy the requirements of Fed.R.Civ.P. 9(b). Christiania decided not to file a third amended complaint, and final judgment dismissing the action was entered on August 26, 1991. Christiania appeals. We affirm in part, reverse in part, and remand this case to the district court.

## DISCUSSION

■ In this diversity litigation, New York law controls. A reinsurance contract is governed by the rules of construction applicable to contracts generally. *See Sun Mutual Ins. Co. v. Ocean Ins. Co.,* 107 U.S. 485, 506, 1 S.Ct. 582, 596, 27 L.Ed. 337 (1882); *London Assurance Corp. v. Thompson,* 170 N.Y. 94, 99, 62 N.E. 1066 (1902); 19 G. Couch, Cyclopedia of Insurance Law § 80:48 (Rev.2d ed. 1983) (Couch). Thus, when the terms of the contract ("prompt notice") are ambiguous, as here, reference to extrinsic evidence provides guidance to the parties' intent. *See Seiden Assocs., Inc. v. ANC Holdings, Inc.,* 959 F.2d 425, 428–29 (2d Cir.1992). Such extrinsic evidence may in appropriate cases include industry custom and practice. *See London Assurance,* 170 N.Y. at 99, 62 N.E. 1066. And, though the construction of a contract is a matter of law, when resort to extrinsic evidence is necessary to shed light on the parties' intent summary judgment ordinarily is not an appropriate remedy, *see Seiden,* 959 F.2d at 428, and must be denied unless, viewing the evidence in a light most favorable to the nonmovant and resolving all doubts in its favor, no reasonable trier of fact could find against the movant. *See id.* at 429.

### I Notice

■ For a reinsurer to be relieved from its indemnification obligations because of the reinsured's failure to provide timely notice, absent an express provision in the contract making prompt notice a condition precedent, it must show prejudice resulted from the delay. *See Unigard Security Ins. Co., Inc. v. North River Ins. Co.,* 79 N.Y.2d 576, 582, 584 N.Y.S.2d 290, 594 N.E.2d 571 (1992) (*North River*). The district court found that Great American's duty to provide notice accrued in April 1987, but that there were genuine issues of material fact as to whether the delay before notice was actually given in June or July of 1987 made the notice untimely. Because Christiania conceded it was unable to demonstrate prejudice as a result of this delay, it was unnecessary for the district court to decide whether defendant's notice was in fact untimely, and this count in the complaint was dismissed. We think the district court incorrectly concluded that, as a matter of law, the notice provisions in the reinsurance certificates were triggered no earlier than April 1987 when Great American decided to set reserves.

### A. Effect of Setting Reserves on Notice

■ The primary functions served by prompt notice to a reinsurer are to enable it to set proper reserves covering anticipated losses, to decide whether it wishes to exercise its right to associate in the defense of a particular claim, and to establish premiums that accurately reflect past loss experience. *See Unigard Security Ins. Co., Inc. v. North River Ins. Co.,* 762 F.Supp. 566, 581 (S.D.N.Y.1991) (*Unigard*); *see also Commercial Union Ins. Co. v. International Flavors & Fragrances, Inc.,* 822 F.2d 267, 271 (2d Cir.1987). Reserves reflect the insurer's estimation of expected losses and appear as liabilities on its financial statements. *See Unigard,* 762 F.Supp. at 580. New York imposes reserve requirements on both insurers and reinsurers. *See* N.Y.Ins.Law §§ 1303, 4117 (McKinney 1985). Unlike defending a claim in court where the reinsurer may often rely on the defense interposed by the reinsured, *see North River,* 79 N.Y.2d at 583, 584 N.Y.S.2d 290, 594 N.E.2d 571, the interests of the reinsured and the reinsurer in setting reserves are not always the same. *See Unigard,* 762 F.Supp. at 580.

■ For example, though New York requires an insurer to maintain a certain level of assets relative to its outstanding policies, reinsurance indemnification obligations owed to an insurer may be considered in computing such assets. *See* N.Y.Ins.Law § 1301(a)(14); *Skandia Am. Reinsurance Corp. v. Schenck,* 441 F.Supp. 715, 724 (S.D.N.Y.1977); *see also* N.Y.Ins.Law § 1308. This is in fact a primary function of reinsurance—enabling the reinsured to reduce the amount of reserves it is required to carry on its books. *See Midland,* 79 N.Y.2d at 258, 582 N.Y.S.2d 58, 590 N.E.2d 1186; *Skandia,* 441 F.Supp. at 724. Accordingly, an insurer will not infrequently have ceded its entire risk, or at least a substantial portion of it, to reinsurers. To the extent the ceding company bears little or no risk of loss, it has no strong incentive promptly to establish reserves accurately reflecting the potential loss presented by a claim. *See Unigard,* 762 F.Supp. at 580. When reserves are set by the reinsured is therefore not always an accurate point at which to mark the time the ceding reinsured's notice obligation began to run. Setting reserves is merely one factor in assessing when the obligation to give notice arises. *See id.* at 581. *But see Travelers Ins. Co. v. Central Nat'l Ins. Co. of Omaha,* 733 F.Supp. 522, 529 (D.Conn.1990) (Connecticut law).

Thus, in *Unigard,* it was held that an excess layer insurer's duty to provide notice to its reinsurer accrued when the reinsured knew of the exhaustion of the layer *two* layers below it, before the reinsurer had itself set reserves. *See* 762 F.Supp. at 591. Here, that would correspond to the time when Great American learned that *INA's* layer had been *pierced,* not when defendant learned that INA's layer was on the verge of being *exhausted.* Further, the fact that Great American officials themselves appeared to recognize the necessity of notifying reinsurers well before April 1987 suggests a reasonably diligent insured in its position would have recognized that its notification obligations arose well before that date. *See id.; see also Viacom Int'l, Inc. v. Lorimar Productions, Inc.,* 486 F.Supp. 95, 98 n. 3

(S.D.N.Y.1980) (practical interpretation of contract by parties prior to controversy arising is entitled to great weight in construing its terms).

And, though it might be said that it could not be known prior to Great American's audit being completed in precisely what claims it would be involved, a jury could conclude that once defendant was informed that INA's layer was exhausted on an incurred basis *every* claim ("accident or occurrence") "appeared likely" to involve reinsurance. *Cf. Insurance Co. of Pennsylvania v. Associated Int'l Ins. Co.,* 922 F.2d 516, 521–22 (9th Cir.1990) (where reinsured notified by original insured that reinsured's excess layer might become involved by virtue of number of claims instituted, court rejects reinsured's argument that notice obligation met to reinsurer by providing prompt notice once informed underlying limits were nearing exhaustion).

### B. *When Should Notice Be Given*

■ A reinsured's decision to set reserves, necessarily a subjective determination, is not the only basis upon which it may be concluded the duty to provide notice to reinsurers was triggered, which is an objective determination. Clauses in insurance contracts requiring "prompt notice," notice "as soon as practicable," or "immediate notice" are generally construed to require notice within a reasonable time after the duty to give notice has arisen. *See Security Mutual Ins. Co. v. Acker–Fitzsimons Corp.,* 31 N.Y.2d 436, 441, 340 N.Y.S.2d 902, 293 N.E.2d 76 (1972). When the duty to provide such notice commences requires an objective evaluation of the facts known to the insured. *See Utica Mutual Ins. Co. v. Fireman's Fund Ins. Cos.,* 748 F.2d 118, 122 (2d Cir.1984). The objective standard is one of reasonableness. While the duty to provide notice therefore does not begin on the basis of mere speculation, rumor, or remote contingencies far removed from the particular policy in question, *see Acker–Fitzsimons,* 31 N.Y.2d at 442, 340 N.Y.S.2d 902, 293 N.E.2d 76, when an insured complying with its duty to use due diligence in investigat-

ing potential claims against it would believe from the information available that its policy would be involved, the notice obligation arises. *See Ogden Corp. v. Travelers Indemnity Co.*, 924 F.2d 39, 43 (2d Cir.1991); *International Flavors*, 822 F.2d at 272; *Utica Mutual*, 748 F.2d at 121–22. *See also Trustees of Univ. of Pennsylvania v. Lexington Ins. Co.*, 815 F.2d 890, 896 (3d Cir.1987); *Liberty Mutual Ins. Co. v. Gibbs*, 773 F.2d 15, 17–18 (1st Cir.1985); *Greyhound Corp. v. Excess Ins. Co. of Am.*, 233 F.2d 630, 635 (5th Cir.1956).

 A provision requiring notice when it "appears likely" that a claim will or "may" involve a policy does not require a probability—much less a certainty—that the policy at issue will be involved. *See Gibbs*, 773 F.2d at 17; *Greyhound*, 233 F.2d at 634–35. All that is required is a "reasonable possibility" of such happening, based on an objective assessment of the information available. *See Ogden Corp.*, 924 F.2d at 43; *International Flavors*, 822 F.2d at 272. Such a possibility may exist even though there are some factors that tend to suggest the opposite. *See Trustees*, 815 F.2d at 896; *Gibbs*, 773 F.2d at 18; *cf. Harbor Ins. Co. v. Trammell Crow Co., Inc.*, 854 F.2d 94, 98 (5th Cir.1988), *cert. denied*, 489 U.S. 1054, 109 S.Ct. 1315, 103 L.Ed.2d 584 (1989). In this connection, the district court observed that INA's and Honda's figures indicated a *strong possibility* that, should INA's reserve figures prove to be correct, defendant's layer of insurance would eventually be reached. Yet, it remained at least *"theoretically possible* that Great American's layer would never actually be called upon to make payments." 745 F.Supp. at 155 (emphasis added).

 A "theoretical possibility" that a policy will not be involved is not an objectively reasonable basis upon which to conclude a claim does not "appear likely" to involve the policy. Nor may Great American be excused for a failure to provide notice because of a possibility—for example, that INA's and Honda's information was inaccurate—that the reinsurance would not be implicated if, despite the existence of other factors suggesting the rein-

surance would be implicated, no investigation was undertaken that would negate that possibility. *See Acker–Fitzsimons*, 31 N.Y.2d at 442–43, 340 N.Y.S.2d 902, 293 N.E.2d 76; *Utica Mutual*, 748 F.2d at 122. Defendant cannot complain that it did not see something when it shut its eyes.

The evidence, viewed in the light most favorable to Christiania, demonstrates a reasonable insured in defendant's position could have believed it "appeared likely" the claims that it was being told about would involve Christiania's reinsurance—i.e. its obligation to give notice occurred—prior to April 1987. Defendant's response is that the reinsurance certificates should not be construed so as to have required notice prior to that date. The argument is that it had no obligation continually to monitor claims in an effort to ascertain, in advance of its layer being pierced on a paid basis, which claims would become its responsibility and when. We think the monitoring issue is one for a jury to resolve. *Cf. Acker–Fitzsimons*, 31 N.Y.2d at 441, 340 N.Y.S.2d 902, 293 N.E.2d 76 (insured must exercise reasonable care and diligence to keep informed of accidents out of which claims may arise).

 The thrust of defendant's contention is it was not possible for it to provide the type of detailed information it provided to its reinsurers at the August 27 meeting until it completed an audit, and it would have been overly burdensome and wasteful for it to have had to undertake such an audit far in advance of its layer being pierced on a paid basis. The problem with this assertion is that it rests on the unstated and unsupported premise that the "notice" required was the "detailed notice" supplied after the audit. This premise in turn is grounded on the notion that earlier notice would not have been helpful to Christiania in deciding whether to exercise its right to associate because the necessary details as to the specific claims that defendant would be called upon the defend were neither known nor knowable prior to the audit being completed.

While all this may very well be true, it ignores the fact that notice serves to aid

the reinsurer in establishing its own reserves as well as in deciding whether to associate. *See, e.g.,* Keeton, at 446 (prompt notice reduces burden of providing reserves for undetermined claims by reducing uncertainty). Great American's contention therefore is nothing more than a sleight-of-hand trick that equates a notice clause with a right to associate clause. If the only purpose of notice was to enable a reinsurer to decide whether to associate, the notice clause would be redundant because notice is a necessary concomitant of the reinsurer's right to associate. Notice is designed to do more than enable the reinsurer to decide whether it should associate in the defense of a particular suit. Nothing suggests the other functions served by notice, that is, setting reserves and fixing premiums, could not be satisfied by an earlier less detailed notice.

Put another way, in arguing it had no duty to provide earlier notice because it had no duty to monitor continually and update the status of cases being handled by the underlying carrier, Great American has the point backwards. If, as it contends, it had no duty to undertake this task earlier—a question in any event to be resolved by the jury in light of industry practice—it may be that it had no such duty precisely because it was not required to give the type of detailed notice that would have required such an investigation. Such detailed notice may have been necessary for defendant to satisfy its obligation to give Christiania an opportunity to associate, but a jury could conclude that the other functions served by notice would and should have been satisfied simply by Great American passing along to plaintiff the information it received from J & H, Honda and INA. Defendant's declaration that it would have been "unduly burdensome" for it to do this is self-serving at best. When asked if there would be any harm to Great American in passing along the preliminary information received from Honda and INA to Christiania, Mr. Runnels responded:

A. Not that I know of.

Q. Is there any expense incurred by Great American by passing that notice along?

A. Postage.

Q. Anything else?

. . . . .

A. ... Not that I know of.

 In a similar vein, and similarly unsupported on the record, is defendant's assertion that it had no duty to provide notice until its layer was about to be pierced on a paid—rather than incurred—basis. Not only is the degree of certainty that this statement suggests is necessary to trigger the notice obligation not found in the case law, *see, e.g., Utica Mutual,* 748 F.2d at 122 n. 4, its effect, if adopted, would be to eviscerate the reserve setting function of requiring prompt notice of claims that "appear likely" to involve reinsurance. *Cf. Unigard,* 762 F.Supp. at 580 (an insurer that waits to set reserves until all the uncertainties relating to a claim are eliminated is not actually reserving at all, but rather is merely paying claims).

Great American cites nothing in support of the notion that an excess layer reinsured has no obligation to notify its reinsurer that a claim appears likely to involve the reinsurance until the reinsured's policy is on the verge of being pierced on a paid basis. To the contrary, New York requires insurers (and reinsurers) to set reserves for losses and loss expenses based upon

the *aggregate estimated amounts due or to become due* on account of all known losses and claims and loss expenses *incurred but not paid, including the estimated liability on any notice received by the [insurer] of the occurrence of any event which may result in a loss.*

N.Y.Ins.Law § 4117(b)(1) (McKinney Supp. 1992). *See also* N.Y.Ins.Law § 1303 (McKinney 1985). As explained by Leonard Priesman, a senior claim examiner with the New York State Insurance Department:

Late notice of claims to reinsurers makes proper reserving difficult. Whenever the total *incurred* threatens to penetrate the excess layer, the excess carrier and the reinsurers are required to consider the appropriate reserves to be estab-

lished. *A reinsurer may establish reserves even before its reinsured considers such reserves....* In my over 20 years of claims experience I have never heard the contention that an excess reinsured such as Great American need give notice of known claims to its reinsurers only when the paid loss reaches their excess layer. (emphasis added).

*Cf. Insurance Co. of Pennsylvania,* 922 F.2d at 526 (settlements between reinsured and original insured that address future claims reimbursable under reinsurance contract); *see also Zeig v. Massachusetts Bonding & Ins. Co.,* 23 F.2d 665, 666 (2d Cir.1928) (excess carrier must pay claims to extent its layer is pierced even though underlying carrier settled with insured for less than the full amount of underlying carrier's liability). We decline to adopt therefore, as a matter of law, the proposition that a reinsured is absolved of the duty to notify a reinsurer that it appears likely the reinsurance contract will be involved until the amount or timing of such involvement is fixed with the precision afforded by monitoring claims on a paid basis.

Although an ambiguous reinsurance contract is generally construed against the reinsurer, *see* 19 Couch § 80:49, "[b]eing an insurance company, the reinsured is held to a high degree of compliance with policy provisions which require prompt notice to the reinsurer when a loss occurs which may potentially be within policy coverage." 19 Couch § 80:71. *Accord Insurance Co. of Pennsylvania,* 922 F.2d at 521; *Gibbs,* 773 F.2d at 18; *see Ohio Casualty Ins. Co. v. Rynearson,* 507 F.2d 573, 577 (7th Cir.1974); *Employers' Liability Assurance Corp. v. Travelers Ins. Co.,* 411 F.2d 862, 867 (2d Cir.1969).

In sum, when the obligation to provide notice arose in this case cannot be determined on the face of the agreement without resort to extrinsic evidence, and the record, viewed in the light most favorable to Christiania, would permit a rational jury to find a reasonably diligent insurance company in defendant's position would have thought itself required under the reinsur-

ance certificates and industry practice to provide notice prior to April 1987. Although Christiania conceded it could demonstrate no prejudice as a result of the two-month delay from April to June 1987, it does not follow that if it is determined after a trial that Great American's duty to provide notice arose at some point in time before April 1987, Christiania would not be able to demonstrate prejudice by virtue of the longer delay.

## II Misrepresentation

We consider next the misrepresentation issue. The relationship between a reinsurer and a reinsured is one of utmost good faith, requiring the reinsured to disclose to the reinsurer all facts that materially affect the risk of which it is aware and of which the reinsurer itself has no reason to be aware. *See Sun Mutual,* 107 U.S. at 510, 1 S.Ct. at 599–600; *Sumitomo,* 75 N.Y.2d at 303, 552 N.Y.S.2d 891, 552 N.E.2d 139. In certain cases, the description of items covered under the original policy may be so imprecise as to warrant rescission of the contract because the reinsurer was not adequately apprised of the risk. *See Merchants' & Shippers' Ins. Co. v. St. Paul Fire & Marine Ins. Co.,* 219 A.D. 636, 640–41, 220 N.Y.S. 514 (1st Dep't 1927); *see also Btesh v. Royal Ins. Co., Ltd., of Liverpool,* 49 F.2d 720, 721 (2d Cir.1931). Christiania asserts the right to rescind the instant insurance contracts because ATVs were not listed as a separate category of products distributed by Honda.

A fact is material so as to void *ab initio* an insurance contract if, had it been revealed, the insurer or reinsurer would either not have issued the policy or would have only at a higher premium. *See Merchants',* 219 A.D. at 639, 220 N.Y.S. 514; 2 Dunham, § 29.06[1][b]. Materiality is ordinarily a question of fact, *see Sebring v. Fidelity–Phenix Fire Ins. Co. of New York,* 255 N.Y. 382, 385, 174 N.E. 761 (1931); *Piccininni v. Aetna Life Ins. Co.,* 250 A.D. 498, 499, 294 N.Y.S. 880 (2d Dep't 1937), the standard for disclosure being whether a reasonable insured should have believed the fact was something the insur-

er would consider material. *See Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 13 (2d Cir. 1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987); *Hare & Chase v. Nat'l Surety Co.,* 60 F.2d 909, 911 (2d Cir.), *cert. denied,* 287 U.S. 662, 53 S.Ct. 222, 77 L.Ed. 572 (1932). Of course, materiality must be assessed as of the time the contract was entered into. *See Cahen v. Continental Life Ins. Co.,* 69 N.Y. 300, 307 (1877). The issue here is whether, if ATVs had been independently listed, Christiania would have acted differently, *see Knight,* 804 F.2d at 13; *Geer v. Union Mutual Life Ins. Co.,* 273 N.Y. 261, 270–71, 7 N.E.2d 125 (1937), and, if so, whether Great American should have been aware that such listing would have affected Christiania's decision. *See Btesh,* 49 F.2d at 721; *Merchants',* 219 A.D. at 639, 220 N.Y.S. 514.

The parties do not dispute that in underwriting products liability reinsurance the nature of the products manufactured or distributed by the insured may be material. Arthur Bingay, Christiania's underwriter for the Great American policy, stated that if ATVs had been specifically listed he would have inquired further and if their hazardous nature had been discovered probably would have underwritten the policy only at a higher premium. Still, it is possible a jury could believe this position was simply hindsight, and that because no significant number of ATV claims had been made at the time when the reinsurance certificates were issued and because what was involved was excess insurance, Christiania would not in fact have rejected the risk or accepted the risk only at higher premiums. *See Continental Ins. Co. v. RLI Ins. Co.,* 161 A.D.2d 385, 388, 555 N.Y.S.2d 325 (1st Dep't 1990); *see also Solez v. Zurich General Accident & Liability Ins. Co.,* 54 F.2d 523, 526 (2d Cir. 1931), *cert. granted,* 286 U.S. 538, 52 S.Ct. 639, 76 L.Ed. 1277, *cert. dismissed,* 296 U.S. 668, 57 S.Ct. 756 (1932). Consequently, this issue obviously raises a question of fact not appropriately determined on a summary judgment motion.

■ Nonetheless, that an undisclosed fact may have been material to the reinsurer does not itself enable a reinsurer to rescind because, though the failure to disclose need not be fraudulent or even intentional, the party with a duty to disclose must at least have reason to believe the fact not disclosed is material. *See* 2 Dunham § 29.04[1][b]; *see also, e.g., Knight,* 804 F.2d at 13 (insured must disclose all *known* circumstances that materially affect the risk). Absent such belief, there is not actually a misrepresentation in the sense of a knowing failure to disclose. *Cf. Geer,* 273 N.Y. at 267–68, 7 N.E.2d 125; *Mallory v. Travelers' Ins. Co.,* 47 N.Y. 52, 56 (1871). If defendant cannot be charged with knowledge that as of the time the reinsurance certificates were entered into the risk posed by ATVs required it in good conscience to have listed them specifically as among the risks insured, rescission is not available to plaintiff. *See Sebring,* 255 N.Y. at 386, 174 N.E. 761; *Merchants',* 219 A.D. at 639, 220 N.Y.S. 514; *see also Bronx Sav. Bank v. Weigandt,* 1 N.Y.2d 545, 550, 154 N.Y.S.2d 878, 136 N.E.2d 848 (1956) (representation merely conveys such information applicant might be expected to have and in good faith believes).

■ Christiania effectively conceded its inability to allege the requisite knowledge on defendant's part when it failed to file a third amended complaint, but now attempts to support its assertion that knowledge is not required by relying on the theory that intent or the fact that the failure to disclose is accidental is irrelevant. *See Hare & Chase,* 60 F.2d at 911; *Geer,* 273 N.Y. at 265, 7 N.E.2d 125. This fails to recognize that whether the duty to disclose has been breached is not affected by whether the failure is intentional or inadvertent; rather the duty does not extend to facts of which the reinsured is not, and has no reason to be, aware of as material to the risk. *See Sebring,* 255 N.Y. at 387, 174 N.E. 761; *Btesh,* 49 F.2d at 721 (insured must know that the fact is something affecting the risk; he cannot be required to tell of what he does not know). Similarly, Christiania's reliance on cases holding that where an insured incorrectly responds to an inquiry by the insurer, the latter may vitiate the policy without regard to the

former's actual knowledge as to the incorrect nature of the response, *see Piccininni*, 250 A.D. at 499, 294 N.Y.S. 880; *Solez*, 54 F.2d at 524, is misplaced. Where the insurer specifically inquires as to a fact, the insured is thereby on notice that the insurer considers it material, and therefore is under a duty of inquiry. *See* 2 Dunham § 29.06[1][b].

■ The reinsured's duty of good faith, in the absence of specific inquiry, requires it "to place the underwriter in the same position as himself [and] to give to him the same means and opportunity of judging of the value of the risks." *Sun Mutual*, 107 U.S. at 510, 1 S.Ct. at 600. If Great American reasonably had no reason to believe Christiania would consider Honda's distribution of ATVs material to the nature of the risk because it did not itself so regard this fact at the time, and Christiania did not inquire, it cannot be said the failure to disclose such information deprived Christiania of the same opportunity defendant had to assess the risk. Here Christiania elected to stand on its second amended complaint. But that complaint inadequately alleged that disclosure of the fact that ATVs at the time the reinsurance was issued posed a sufficiently greater risk over and above that posed by "power products" or "motorcycles" so that Great American should have known Christiania's decision to reinsure would have been affected. In light of this pleading failure this claim was properly dismissed.

### III Other Claims

#### A. Ex Gratia *Payments*

■ Christiania also asserts that because defendant's payments to Honda were *ex gratia*, Christiania is not required to indemnify. The point made is that if defendant did not know the risks presented by ATVs were material, it was therefore entitled to rescind its contract with Honda. Great American's failure to do so means the payments made were beyond those for which Christiania was obligated to indemnify because defendant itself was not required to make them. Even assuming, *arguendo*, defendant could have rescinded its

policy with Honda, Christiania's argument is without merit.

■ The parties' contract states that "[t]he reinsurance provided under this certificate shall follow coverage of [Great American's] policy." Under the "follow the fortunes" doctrine, a reinsurer is required to indemnify for payments reasonably within the terms of the original policy, even if technically not covered by it. *See Unigard*, 762 F.Supp. at 586. A reinsurer cannot second guess the good faith liability determinations made by its reinsured, or the reinsured's good faith decision to waive defenses to which it may be entitled. *Id. See Insurance Co. of New York v. Associated Mfrs.*, 70 A.D. 69, 70–71, 74 N.Y.S. 1038 (1st Dep't 1902) (absent fraud or bad faith on part of reinsured, reinsurer may not object to reinsured's settlement of a claim), *aff'd*, 174 N.Y. 541, 66 N.E. 1110 (1903). Although a reinsurer is not obligated to indemnify for payments clearly beyond the scope of the original policy, *see American Ins. Co. v. North Am. Co. for Property & Casualty Ins.*, 697 F.2d 79, 81 (2d Cir.1982), or in excess of its agreed-to exposure, *see Bellefonte Reinsurance Co. v. Aetna Casualty & Surety Co.*, 903 F.2d 910, 912–14 (2d Cir.1990), this is not a case where it can be said requiring indemnification would impose liability on Christiania "for risks not encompassed by the underlying policy." 1 Dunham § 15.05[2]; *cf. Jackson v. St. Paul Fire & Marine Ins. Co.*, 99 N.Y. 124, 129–30, 1 N.E. 539 (1885).

#### B. *Breach of Duty*

■ Finally, Christiania contends defendant breached its fiduciary duty and/or its duty to deal in utmost good faith by virtue of its conscious decision not to provide notice sooner and in failing to provide accurate information to its reinsurers when it did give notice. Christiania's characterization of the relationship between a reinsured and reinsurer as being inevitably fiduciary in nature is one we are unable to adopt. To the contrary, because these contracts are usually negotiated at arms length by experienced insurance companies, *see Unigard*, 762 F.Supp. at 591, there is no reason

to label the relationship as "fiduciary." *See Morrison Assurance Co. v. North Am. Reinsurance Corp.*, 588 F.Supp. 1324, 1328 (N.D.Ala.1984), *aff'd*, 760 F.2d 279 (11th Cir.1985). *Compare Columbian Nat'l Fire Ins. Co. v. Pittsburgh Fire Ins. Co.*, 236 Mich. 243, 210 N.W. 258, 259 (1926) (because parties not dealing at arms length, reinsured occupied fiduciary position to reinsurer).

■ With respect to plaintiff's challenge to defendant's alleged breach of duty to act in utmost good faith by failing to provide notice prior to April 1987, it is difficult to understand precisely what Christiania's challenge is. Specifically, the significance of defendant's "conscious," or knowing decision not to provide notice sooner is not explained by Christiania. If a jury determines that defendant should have provided notice earlier than it did—whether its failure was conscious or otherwise—then the "prompt notice" requirement has not been satisfied. It seems that what Christiania would have us do is supplant the New York rule that a reinsurer must prove prejudice as a result of late notice by holding that "consciously" late notice, without more, is sufficient to entitle the reinsurer to relief. We reject this invitation.

At most, a reinsured's failure to provide prompt notice may entitle the reinsurer to relief without showing prejudice if the reinsured acted in bad faith. *See Fortress Re, Inc. v. Central Nat'l Ins. Co.*, 766 F.2d 163, 165–66 (4th Cir.1985) (North Carolina law). *See also St. Paul Fire & Marine Ins. Co. v. U.S. Fidelity & Guaranty Co.*, 43 N.Y.2d 977, 978–79, 404 N.Y.S.2d 552, 375 N.E.2d 733 (1978) (where, after insured's liability had been adjudged by jury, primary insurer acted in bad faith in refusing to settle claim for amount within its policy limits, thereby placing excess carrier alone at risk, excess carrier could recover against primary insurer); *Hartford Accident & Indemnity Co. v. Michigan Mutual Ins. Co.*, 93 A.D.2d 337, 342, 462 N.Y.S.2d 175 (1st Dep't 1983) (where primary insurer placed its own interests above those of excess insurer duty to proceed in good faith and in the exercise of honest discretion violated), *aff'd*, 61 N.Y.2d 569, 475 N.Y.S.2d 267, 463 N.E.2d 608 (1984).

■ That Great American may have altered its reinsurance notification procedures for the Honda account does not, standing alone, create a jury question on the issue of good faith. Of course, defendant's normal reserve setting and notice of loss procedures—that, according to Christiania, would have resulted in its receipt of notice well before the summer of 1987—might be relevant regarding what the parties' intended their contract to require concerning notice. Nothing before us suggests defendant's failure to provide notice sooner or its change in procedure was undertaken in bad faith or was purposely intended to deprive Christiania of earlier notice.

As to whether the information provided its reinsurers demonstrates a "lack of candor" and therefore a breach of Great American's duty to act in utmost good faith, this is more usefully analyzed under the rubric of whether defendant satisfied its obligation to provide notice that was sufficient to fulfill the purposes for which reinsurers require notice. If the information provided by Great American at the August 27 meeting was inaccurate or misleading, any such derelictions may be remedied under traditional contract principles concerning substantial compliance and material breaches, without the necessity of asking whether any "lack of candor" amounted to a breach of a duty independent of the contract itself or the implied duty of good faith found as a matter of law in every New York contract.

## CONCLUSION

The district court's dismissal of Christiania's misrepresentation and breach of duty claims is affirmed. The dismissal of Christiania's claim alleging untimely notice is reversed and the complaint is reinstated with directions to the district court to proceed to trial on the question of whether Great American satisfied its contractual obligation and, if not, whether Christiania suffered prejudice as a result.

Affirmed in part, reversed in part, and remanded.