**BRITISH INSURANCE COMPANY OF CAYMAN, Appellant**

v.

**SAFETY NATIONAL CASUALTY.**

No. 01–3632.

United States Court of Appeals, Third Circuit.

Argued: July 15, 2002.

Filed: July 3, 2003.

---

Shawn L. Kelly, (Argued), Thomas J. Perry, Caroline Brizzolara, Riker, Danzig, Scherer, Hyland & Peretti, LLP, Morristown, for Appellant.

John C. Sullivan, (Argued), Barbara S. Magen, Post & Schell, P.C., Vorhees, for Appellee.

Before McKEE, WEIS and DUHE,* Circuit Judges.

## OPINION OF THE COURT

McKEE, Circuit Judge.

British Insurance Company of Cayman appeals the district court's grant of summary judgment to Safety National Casualty Corporation in this reinsurance dispute between the two insurance companies. The dispositive issue is whether, under New Jersey law, a reinsurer must show prejudice in order to prevail on a late notice defense asserted against its reinsured. This issue has yet to be considered by the New Jersey Supreme Court. As it was required to do, the district court predicted that the New Jersey Supreme Court would hold that a reinsurer is not required to show prejudice in order to succeed on a late notice defense. However, we disagree and predict that the New Jersey Supreme Court would require a reinsurer to demonstrate prejudice in order to prevail. Therefore, we will reverse and remand for proceedings consistent with this opinion.

* The Honorable John M. Duhe, Jr., Senior Circuit Judge, United States Court of Appeals for the Fifth Circuit, sitting by designation.

## I.

American Centennial Insurance Company, the predecessor-in-interest to British Insurance Company of Cayman, issued an insurance policy to May Department Stores that provided excess workers' compensation and employer liability coverage from February 1, 1982 to February 1, 1983 (the "Excess Policy"). The Excess Policy provided $10,000,000 in workers' compensation coverage in excess of a $250,000 self-insured retention ("Retention"). The Retention required that May pay the first $250,000 before American Centennial would have any obligation under the Excess Policy.

American Centennial then entered into a reinsurance contract with Safety National Casualty Company through a Certificate of Facultative Reinsurance ("Facultative Certificate"). Pursuant to the terms of the Facultative Certificate, Safety National agreed to indemnify American Centennial for any losses in excess of the $250,000 Retention up to $750,000, and to indemnify American Centennial up to $5,000,000 for any losses in excess of $5,250,000. The Facultative Certificate contains a notice provision which provides, in relevant part:

> The Company shall advise Reinsurer promptly of any claim and any subsequent developments pertaining thereto which, in the opinion of the Company, may involve the reinsurance hereunder.... The Company, when so requested, will afford the Reinsurer an opportunity to be associated with the Company, at the expense of the Reinsurer, in the defense or control of any claim, suit or proceeding involving this reinsurance, and the Company and the Reinsurer shall cooperate in every re-

spect in the defense and control of such claim, suit or proceeding.

App. at 82.

Pursuant to an Assumption Reinsurance Agreement dated August 29, 1996, American Centennial assigned the Facultative Certificate to British Insurance. Thereafter, British Insurance assumed the Facultative Certificate pursuant to an Assumption Reinsurance Agreement dated November 30, 1998.

On March 18, 1982, Anthony Kirtos, a truck driver employed by May in Ohio, suffered back and neck strain while carrying a sofa in the course of his employment. Kirtos filed a workers' compensation claim against May, and May arranged for Central Regional Claims Corporation ("Adjuster") to administer Kirtos' claim. The Adjuster, by letter dated March 15, 1985, reported the Kirtos claim to May's insurance broker, Marsh & McLennan ("Marsh"). Marsh notified American Centennial of the Kirtos claim by letter dated April 9, 1985. In the March 15, 1985 letter, the Adjuster stated that its submission of the claim "does not necessarily indicate a belief that the excess coverage will be involved, but is rather, an interpretation of the carrier's wishes to be notified."

The Claims Summary Report, which was included in the materials provided to American Centennial, advised American Centennial that as of April 9, 1985, May had paid only $42,582.28 in medical and indemnity payments from the date Kirtos filed his claim. The Report also advised American Centennial that as of August 15, 1984, Kirtos was receiving temporary and total disability benefits and estimated that the temporary and total disability benefits would continue for 127 weeks. The Report informed American Centennial that the Adjuster estimated May's reserves at $81,605 for indemnity and $14,000 for medical payments, for a total estimated reserve of $95,605. Finally, the Report advised that May's total paid losses plus its estimated reserve equaled $138,187.28.

On April 24, 1985, after receiving notice of the Kirtos claim, American Centennial opened a claims file. However, it closed that filed the same day, or shortly thereafter, after determining that the Kirtos claim "won't reach American Centennial layer." App. at 145. American Centennial did not provide notice to Safety National or take any action on the Kirtos claim from at least May 1985 until April 1992. During that time, May continued to administer the Kirtos claim. Among other things, the Adjuster retained counsel and contested Kirtos' claim in workers' compensation administrative proceedings in Ohio.

On April 9, 1992, at the Adjuster's request, Marsh advised American Centennial that the Kirtos claim was still active. American Centennial responded by informing the Adjuster that it had closed its file on the Kirtos claim, but it nonetheless offered to continue communicating with the Adjuster about the claim.

By letter dated June 11, 1992, the Adjuster sent its Kirtos file (dating back to 1989) to American Centennial and informed American Centennial that it was continuing to investigate the claim in order to evaluate exposure for permanent total disability benefits. There is a dispute between the parties as to whether the June 11, 1992 letter disclosed that Kirtos had filed an application for Permanent and total disability benefits that was then pending.

However, the June 11, 1992 letter did provide American Centennial with a summary of the amounts spent as of that date and the Adjuster's reserve analysis for the Kirtos claim. The letter also informed

American Centennial that over $152,000 had been paid as temporary and total disability benefits, that more than $17,000 had been paid in medical expenses with $8,564 incurred but not yet paid, and that over $18,000 had been paid in other expenses. The letter informed American Centennial that May had established a total reserve of $350,900 for the Kirtos claim. That reserve was $100,000 over May's $250,000 Retention.

The Adjuster acknowledged in its June 11, 1992 letter that any money paid out in excess of May's Retention would need prior approval from American Centennial. British Insurance claims that an American Centennial claims examiner spoke to May personnel on more than one occasion and was told that May did not expect that the Kirtos claim would exceed the Retention. Safety National disputes British Insurance's claim and contends that there is no documentation in the claims file of any such contact between American Centennial and the Adjuster. Safety National claims that American Centennial did not undertake any activity on the Kirtos claim between August 1992 and March 1994. For its part, British Insurance only says that American Centennial's claims file does not include any documentation of activity between the Adjuster and American Centennial.

Kirtos was awarded Permanent and total disability benefits by the Industrial Commission of Ohio on August 17, 1993. The Commission found that Kirtos was "permanently and totally disabled," that he was prevented from "obtaining useful employment skills," and that compensation for his disability was "to continue without suspension unless future facts and circumstances should warrant the stopping of payment." Supp.App. at 116–117. British Insurance claims that on or about March 1, 1994, the Adjuster told American Centen-

nial that Kirtos had been awarded permanent and total disability benefits; however, Safety National disputes that claim. In any event, it is clear from a memorandum dated March 23, 1994 from American Centennial's claims examiner to American Centennial's Vice President and Counsel that at least by that date American Centennial knew that Kirtos had been awarded permanent and total disability. In that memorandum, American Centennial's claims examiner recommended to American Centennial's Vice President and Counsel that American Centennial set an indemnity reserve of $100,000. That reserve was posted on April 1, 1994. American Centennial had not previously established any reserve for the Kirtos claim.

Theoretically, whenever a reserve is set on a claim, American Centennial's "Re-Bus" computer system automatically generates a Reinsurance Loss Advice ("RLA"). When a Loss advice is generated, American Centennial's established practice is to send the Loss advice to the reinsurer providing the reinsurer with, *inter alia*, notice of the loss for which the reserve was set. British Insurance claims that the Loss advice on the Kirtos claim was generated on May 11, 1994 and sent to Safety National together with a cover letter dated May 11, 1994. However, the Loss advice is dated May 13, 1994. Not unexpectedly, Safety National contends that American Centennial could not, on May 11, 1994, have mailed a Loss advice that was not printed until May 13, 1994. In addition, Safety National claims that it has no record of having received the Kirtos Loss advice at any time in 1994 and further claims that there was no communication from American Centennial about the Kirtos claim between May 1994 and July 1997.

In May 1997, May submitted its first bill to British Insurance for $8,535.26 in excess

of the $250,000 Retention. British Insurance paid May and adjusted the reserve for the Kirtos claim to $91,464.74. British Insurance claims that it also generated another Loss advice which it forwarded to Safety National in July 1997. However, that Loss advice was returned to British Insurance by the postal service because of an incorrect address. British Insurance and Safety National dispute when the Loss advice was sent to Safety National again. On August 12, 1997, Safety National responded to the Kirtos notice of loss.

On December 3, 1998, British Insurance advised Safety National that it was increasing its reserve on the Kirtos claim to $200,000 to reflect the estimated cost of a $127,962 annuity to provide lifetime income and a medical annuity to Kirtos. On December 10, 1997, Safety National responded by issuing a reservation of rights letter. Safety National has since refused to indemnify British Insurance.

## II.

On June 9, 1999, British Insurance filed suit against Safety National in the Superior Court of New Jersey, Trial Division. Safety National removed the suit to the United States District Court for the District of New Jersey on July 14, 1999, pursuant to 28 U.S.C. § 1441.[1] In its complaint, British Insurance sought recovery of the reinsurance balances it alleged are due under the Facultative Certificate. It also sought a declaration that Safety National is obligated to pay the ongoing amounts billed to Safety National for losses incurred under the Facultative Certificate.

After the close of discovery, British Insurance and Safety National filed cross motions for summary judgment. Safety National argued that it is not obligated to indemnify British Insurance because British Insurance's predecessor, American Centennial, failed to give it timely notice of the Kirtos claim as required by the terms of the Facultative Certificate. British Insurance countered by contending that it did give timely notice, but it also argued that even if its notice was untimely, it was nevertheless entitled to summary judgment because Safety National could not demonstrate that it suffered any prejudice as a result of the purportedly delinquent notice. The district court, applying New Jersey law,[2] found that American Centennial failed to provide timely notice of the Kirtos claim to Safety National as required by the Facultative Certificate, and that New Jersey law does not require a showing of prejudice in order to prevail on a late notice defense in a reinsurance case. Accordingly, on June 1, 2001, the district court denied British Insurance's motion and granted Safety National's cross-motion for summary judgment. *British Ins. Co. of Cayman v. Safety Nat'l Cas. Corp.,* 146 F.Supp.2d 585 (D.N.J.2001). This appeal followed.

## III.

As we noted in our prefatory remarks, the dispositive issue before us is whether, under New Jersey law, a reinsurer must show prejudice in order to prevail on a late notice defense asserted against its rein-

---

**1.** The district court had diversity jurisdiction under 28 U.S.C. § 1332. British Insurance is a Cayman Island corporation and maintains a principal place of business in Wilmington, Delaware. Safety National is a Missouri corporation and maintains a principal place of business in St. Louis, Missouri.

**2.** At oral argument in the district court on the motions for summary judgment, British Insurance and Safety National agreed that New Jersey substantive law applies to this issue.

sured.[3] This issue has never been considered by the New Jersey Supreme Court. Indeed, it appears that this issue has never been considered by any New Jersey court. Therefore, because the New Jersey Supreme Court has yet to consider this issue, it was the duty of the district court to predict how the New Jersey Supreme Court would rule if faced with the issue. *See Nationwide Mutual Ins. Co. v. Buffetta,* 230 F.3d 634, 637 (3d Cir.2000). Our review of the district court's prediction is plenary. *Id.* "In predicting how the highest court of the state would resolve the issue, we must consider relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable date tending convincingly to show how the highest court in the state would decide the issue at hand." *Id.* (citation and internal quotations omitted).

■ The district court began it analysis by acknowledging that under New Jersey law, a primary insurance carrier can prevail on a late notice defense only if it can show the likelihood of prejudice as a result of the late notice. 146 F.Supp.2d at 593 (citations omitted). However, it predicted that the courts of New Jersey would not apply this prejudice requirement to reinsurance contracts. It reasoned that this requirement is needed to protect the interests of individual policyholders who have executed insurance contracts which are contracts of adhesion. *Id.* However, the district court reasoned that reinsurance

contracts are not contracts of adhesion because they involve two sophisticated business parties who are familiar with the reinsurance business and who negotiate at arms-length for the terms of the reinsurance contract. *Id.* Accordingly, the district court concluded that there was no corresponding reason to protect individual reinsurers, and the terms of the reinsurance contract therefore ought to govern. The district court also noted that reinsurance contracts are not contracts of insurance as much as they are contracts of indemnity. *Id.* Given these considerations, the district court determined that the rule requiring prejudice did not apply to the policy of reinsurance at issue here.

■ However, we believe the district court's analysis failed to properly consider the role of notice in reinsurance contracts. Admittedly, there are significant differences between primary insurance and reinsurance. In a primary insurance contract, the primary insurance company agrees to indemnify the insured from losses up to a specified limit upon the happening of specified events. *Unigard Security Ins. Co., Inc. v. North River Ins. Co.,* 79 N.Y.2d 576, 584 N.Y.S.2d 290, 594 N.E.2d 571, 574 (1992). In a reinsurance contract, one insurance company (the "ceding insurer" or the "reinsured"), cedes all or part of the risk that it has underwritten pursuant to an insurance policy or polices to another insurer (the "reinsurer"), in return for a

---

**3.** The district court found that American Centennial should have given notice of the Kirtos claim to Safety National as early as 1985 or, alternatively, as late as 1992. 146 F.Supp.2d at 592. It also found that the earliest American Centennial provided notice was 1994. *Id.* at 593. Therefore, it held that the notice was untimely. *Id.* British Insurance argues that by finding that notice should have been given as early as 1985 or as late as 1992, the district court rejected British Insurance's version of the facts and accepted Safety National's.

Consequently, British Insurance submits that the district court improperly resolved disputed issues of fact in its summary judgment analysis.

However, we need not address British Insurance's timeliness argument because British Insurance concedes that the prejudice issue is dispositive. *See* British Insurance's Br. at 25 ("Whether Safety National must show prejudice in order to establish late notice is dispositive in this case.").

percentage of the premium.[4] *Id.; Unigard Sec. Ins. Co., Inc. v. North River Ins. Co.,* 4 F.3d 1049, 1053 (2d Cir.1993). A reinsurance contract confers no rights on the insured. *Unigard Sec. Ins. Co.,* 584 N.Y.S.2d 290, 594 N.E.2d at 574. In fact, the reinsurer is not directly liable to the insured. *Unigard,* 4 F.3d at 1054. The reinsurer's only obligation is to indemnify the ceding insurer on the risk transferred. *Id.; Christiania Gen. Ins. Corp. of New York v. Great American Ins. Co.,* 979 F.2d 268, 270 (2d Cir.1992). Moreover, "[r]einsurers do not examine risks, receive notice of loss from the original insured, or investigate claims. In practice, the reinsurer has no contact with the insured." *Unigard,* 4 F.3d at 1054.

Reinsurance serves two important purposes—it diversifies the risk of loss and reduces the need for required insurance reserves. *Id.* at 1053. As the Court of Appeals for the Fourth Circuit has noted:

> Spreading the risk prevents a catastrophic loss from falling upon one insurer. By reducing the legal reserve requirement, the ceding insurer then possesses more capital to invest or to use to insure more risks.

*Id.* at 1053 (citation omitted).

■ However, despite the differences between primary insurance contracts and reinsurance contracts, reinsurance contracts are obviously still contracts. *See Christiania Gen. Ins. Corp.,* 979 F.2d at 271 ("Simply put, reinsurance is a contract by which one insurer insures the risks of another insurer.") (citations, internal quotations and brackets omitted). Accordingly, "[a] reinsurance contract is governed by the rules of construction applicable to contracts generally." *Id.*

■ We begin our analysis by acknowledging the well-settled New Jersey rule that a primary insurance carrier must show a likelihood of appreciable prejudice to prevail on a late notice defense asserted against its insured. *Cooper v. Government Employees Ins. Co.,* 51 N.J. 86, 237 A.2d 870, 874 (1968); *Pfizer, Inc. v. Employers Ins. of Wausau,* 154 N.J. 187, 712 A.2d 634, 644 (N.J.1998). Prejudice in a late notice defense is determined by examining (1) whether substantial rights have been irretrievably lost and (2) the likelihood of success of the insurer in defending against the victim's claim. *Baen v. Farmers Mut. Fire Ins.,* 318 N.J.Super. 260, 723 A.2d 636, 641 (1999) (citation omitted). The insurer seeking to avoid coverage has the burden of demonstrating prejudice for late notice. *Cooper v. Government Employees Ins. Co.,* 237 A.2d at 874.

In *Pfizer,* the New Jersey Supreme Court noted that most primary liability insurance contracts contain provisions requiring that policyholders give "prompt notice of an occurrence that gives rise to coverage under the policy." 712 A.2d at 643. Significantly, the New Jersey Supreme Court opined that *"[u]nder traditional contract-law principles,* breach of such a contractual condition would excuse the aggrieved parties' performance only if a party was actually prejudiced by the delay." *Id* (Emphasis added). It then concluded that the purpose of the New Jersey rule requiring the showing of prejudice "is to protect the interests of policyholders because [primary] insurance con-

---

4. There are two types of reinsurance – facultative and treaty. *Christiania Gen. Ins. Corp. of New York v. Great American Ins. Co.,* 979 F.2d 268, 271 (2d Cir.1992). "Facultative reinsurance covers only a particular risk or a portion of it, which the reinsurer is free to accept or not." *Id.* (citations omitted). "Treaty insurance obligates the reinsurer to accept in advance a portion of certain types of risks that the ceding insurance company underwrites." *Id.* (citations omitted).

tracts are contracts of adhesion and policyholders should not lose the benefits of coverage unless the delay has prejudiced the insurance company." *Id.* at 644. The district court recognized that contracts of reinsurance do not bear all the indicia of adhesion endemic in contracts for primary coverage. However, this does not negate the New Jersey Supreme Court's concern that an insured not forfeit the insurance benefits it has paid for absent sound reasons for denying the coverage. *See also Cooper*, 237 A.2d at 874 ("The [primary] insurance contract not being a truly consensual arrangement and being available only on a take-it-or-leave-it basis, *and the subject being in essence a matter of forfeiture*, we think it appropriate to hold that the [primary insurance] carrier may not forfeit the bargained for protection unless there is both a breach of the notice provision and a likelihood of appreciable prejudice.") (emphasis added).

 Reinsurance contracts are clearly more in the nature of indemnity agreements between two sophisticated insurance companies than contracts of adhesion. However, as noted earlier, they are nevertheless governed by the rules of contract construction. Thus, we find no reason to conclude that the New Jersey Supreme Court would refuse to extend the general contract law principle it referenced in *Pfizer*, requiring prejudice as a condition precedent to forfeiting insurance benefits based upon late notice, to reinsurance contracts as well as contracts for primary coverage. The New Jersey Supreme Court clearly frowns upon literal interpretation of notice provisions in situations where it results in the insured forfeiting

coverage it has already paid for absent some countervailing consideration (such as prejudice) on the part of the insurer that has accepted premiums in return for offering coverage. We therefore conclude that the New Jersey Supreme Court would require the reinsurer to demonstrate prejudice where, as here, the reinsurer relies upon late notice as a defense against the otherwise legitimate claims of its reinsured.[5]

Our conclusion is consistent with, and reinforced by, the differences in the contractual undertakings of primary insurers and reinsurers because notice provisions are significantly less important to the reinsurer than a primary insurer. "The purpose of notice and proof of loss clauses in primary insurance contracts is to afford the insurer an opportunity to form an intelligent estimate of its liabilities, to afford it an opportunity to investigate the claim while witnesses and facts are available, and to prevent fraud and imposition upon it." *Security Mut. Cas. Co. v. Century Cas. Co.*, 531 F.2d 974, 978 (10th Cir.1976). We elaborated upon this in *Trustees of the Univ. of Pennsylvania v. Lexington Ins. Co.*, 815 F.2d 890 (3d Cir.1987), where we stated that the purpose of including a prompt notice of claim provision in a primary insurance contract is

> to give the insurer an opportunity to acquire, through an adequate investigation, full information about the circumstances of the case, on the basis of which, it can proceed to disposition either through settlement or defense of the claim.

5. Other courts have held that a reinsurer is required to show prejudice to prevail on a late notice defense. *See Christiania Gen. Ins. Corp.* 979 F.2d at 274; *Unigard Sec. Ins. Co.*, 584 N.Y.S.2d 290, 594 N.E.2d at 573; *Ins. Co. of the State of Pennsylvania v. Associated Int'l*

*Ins. Co.*, 922 F.2d 516, 523 (9th Cir.1990). Although none of these decisions involved the application of New Jersey Law, they are consistent with our view of how the New Jersey Supreme Court would resolve this dispute.

Thus, a reasonable notice clause is designed to protect the insurance company from being placed in a substantially less favorable position that it would have been if timely notice had been provided, e.g., being forced to pay a claim against which it has not had an opportunity to defend effectively.

*Id.* at 897 (quoting *Brakeman v. Potomac Ins. Co.*, 472 Pa. 66, 371 A.2d 193, 197 (1977)).

However, a reinsurer's contractual undertakings are significantly different from a primary insurer's.

A reinsurer is not responsible for providing a defense, for investigating the claim or for attempting to get control of the claim in order to effect an early settlement. Unlike a primary insurer, it may not be held liable to the insured for a breach of these duties. Settlements, as well as the investigation and defense of claims are the sole responsibility of the primary insurer; and settlements made by the primary insurer are, by express terms of the reinsurance certificate, binding on the reinsurer.

*Unigard Sec. Ins. Co.*, 584 N.Y.S.2d 290, 594 N.E.2d at 574. Since a reinsurer is not obligated to investigate, litigate, settle or defend claims, the "failure to give the required prompt notice is of substantially less significance for a reinsurer than for a primary insurer." *Id.* Consequently, prompt notice is not as critical to a reinsurer as it is to a primary insurer, and ritualistic adherence to prompt notice clauses in reinsurance contracts in the absence of prejudice to the reinsurer does little more than provide the reinsurer with a convenient and inequitable avenue to escape from its obligations under its policy with its reinsured.

We are, of course, aware that the Facultative Certificate here gave Safety National the right to associate with American Centennial in the defense of the Kirtos claim. A "right to associate" is the right of the reinsurer "to consult with and advise the reinsured in its handling of the claim." *Unigard Sec. Ins. Co.*, 584 N.Y.S.2d 290, 594 N.E.2d at 575. However, even if it is assumed for argument's sake that a reinsurer's right to associate can be impaired by a late notice from the reinsured, that risk of impairment is not sufficiently serious to allow us to predict that the New Jersey Supreme Court would abandon the prejudice rule here. The basis for this conclusion is twofold. First, reinsurers rarely exercise their right to associate. *See* 14 *Appleman on Insurance: Law of Reinsurance*, § 105.7 at 384 (2d ed. 2000) ("[A]lthough reinsurance contracts commonly reserve the reinsurer's right to associate with the ceding insurer in the defense or control of claims involving the reinsurance, reinsurers rarely involve themselves in the defense or investigation of the underlying claims."); *Unigard Sec. Ins. Co.*, 584 N.Y.S.2d 290, 594 N.E.2d at 575 ("Indeed, it has been noted that reinsurers seldom have occasion to exercise their right to associate.") (citations omitted). Second, and more importantly, however, the primary exposure of the reinsured gives it as much, if not more, reason to ensure that a claim is properly investigated and defended. *See Security Mut. Cas. Co.*, 531 F.2d at 978.[6]

## IV.

Accordingly, for all of the above reasons, we hold that the New Jersey Supreme Court, if faced with the issue, would rule

---

6. However, by saying this, we do not mean to suggest that a reinsurer can never demonstrate prejudice based upon the impairment of its right to associate. We simply note that there has been no such showing here.

that, under New Jersey law, a reinsurer must show the likelihood of appreciable prejudice in order to prevail on a late notice defense asserted against its reinsured. Accordingly, we will reverse the district court's grant of summary judgment to Safety National and remand for proceedings consistent with this opinion.[7]

**7.** Safety National claims in its brief that even if we predict that the prejudice rule applies to this appeal, that it has been prejudiced. However, that determination involves findings of fact that are properly left to the district court in the first instance.